IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:11-CV-270-FL

| | |
|---|---|
| United States ex rel. RICKEY HOWARD,      ) | |
| ) | |
| Plaintiff,      ) | |
| ) | |
| v.      ) | |
| ) | |
| CADDELL CONSTRUCTION      ) | |
| COMPANY, INC. an Alabama      ) | |
| Corporation; W.G. YATES & SONS      ) | ORDER |
| CONSTRUCTION COMPANY a      ) | |
| Mississippi Corporation; and JULIAN      ) | |
| MARIE BRESLOW; and DAVID J.      ) | |
| VALDINI & ASSOCIATES, P.A., a      ) | |
| Florida Professional Association,      ) | |
| ) | |
| Defendants.      ) | |

This matter is before the court upon motion for summary judgment by defendants Caddell

Construction Company, Inc. ("Caddell") and W.G. Yates & Sons Construction Company

("Yates") (collectively "defendants").[1] (DE 271). The motion has been briefed fully, and in this

posture the issues raised are ripe for ruling. For the following reasons, the motion is granted.

## STATEMENT OF THE CASE

Plaintiff commenced this False Claims Act case on December 22, 2011, by filing a

complaint in camera and under seal, claiming that defendants engaged in a fraudulent scheme to

---

[1] As set forth in more detail herein, defendants Julian Marie Breslow ("Breslow") and David J. Valdini & Associates, P.A. ("Valdini Law Firm"), are named in the operative second amended complaint, but there has been no proof they have been served with it, and they did not join in the instant motion. All unqualified references to "defendants" in this order are to defendants Caddell and Yates only. The court also constructively has amended the caption of this order to reflect dismissal of other formerly-named defendants as described in more detail herein.

submit false claims and statements regarding their use of small business subcontractors in the course of performing a government construction contract. As relator, on behalf of himself and the United States of America (the "government"),[2] plaintiff asserts the following claims:

1. False claims in violation of 31 U.S.C. § 3729(a)(1)(A);

2. False statements in violation of 31 U.S.C. § 3729(a)(1)(B);

3. Conspiracy to commit violations of False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(C);

4. Reverse false claims, in violation of 31 U.S.C. § 3729(a)(1)(G); and

5. Violation of the Anti-Kickback Act, 41 U.S.C. § 53.[3]

Plaintiff seeks trebled damages, civil penalties, costs, fees, and an award of 25% or 30% of the proceeds of the action, depending on whether the government intervenes and continues in the action.

Upon motions by the government, the court extended the time to intervene seven times, until September 17, 2014. On that date, the court unsealed the case, following notice by the government of its decision to partially intervene for purposes of settling civil claims against former

---

[2]  The False Claims Act allows a person to bring a civil action "for the person and for the United States Government," wherein, as here, "[t]he action shall be brought in the name of the Government." 31 U.S.C. § 3730(b)(1). The government thereafter may elect to "proceed with the action, in which case the action shall be conducted by the Government; or . . . notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action." Id. § 3730(b)(4). Although the terms "relator" and "ex rel." do not appear in the statute, they are the names commonly used to denote a private plaintiff suing on behalf of the government under the False Claims Act. E.g., Cochise Consultancy, Inc. v. United States ex rel. Hunt, 139 S. Ct. 1507, 1514 (2019).

[3]  Plaintiff asserted in his original complaint an additional claim for retaliation, in violation of 31 U.S.C. § 3730(h), which did not carry through to the operative second amended complaint as set forth herein, and which is not subject of the instant motion.

2

defendant David J. Valdini ("Valdini") and defendant David J. Valdini & Associates, P.A., (the "Valdini Law Firm"), and of its decision to decline to intervene as to the remaining defendants.[4]

On March 18, 2015, plaintiff filed an amended complaint.[5]  The court denied defendants' motion to dismiss on February 29, 2016, and a period of discovery followed.[6]  In the course of discovery, the court entered a protective order regarding certain information the government had agreed to produce to plaintiff, relating to criminal proceedings against defendant Breslow and defendant Valdini Law Firm.[7]

On July 17, 2017, with leave of court, plaintiff filed the operative second amended complaint,[8] reasserting the same statutory claims against defendants but with additional and updated facts and theories of relief, based upon additional materials produced by the government.[9]

---

[4]    The government noticed its partial intervention on July 14, 2014, and it reported on August 22, 2014, that a settlement agreement was executed with Valdini and the Valdini Law Firm (DE 41, 44).

[5]    In addition to defendants, plaintiff asserted therein claims against defendant Breslow and defendant Valdini Law Firm. However, plaintiff asserted that he and the United States entered into a settlement agreement with defendant Valdini Law Firm on August 18, 2014, and, as a result, defendant Valdini Law Firm "has been released as to all claims, except for statutory attorneys' fees." (DE 66 at 7 n.1). In addition, that same date, plaintiff filed a document styled as a "notice of voluntary dismissal" as to former defendants Pompano Masonry Corporation; Breslow Construction, LLC; Seitlin & Company; Stephen Jay Siegel; Cleetus Mchenry; Joseph Canitano; Dale A. Belis; and Jillian Breslow Phelps.

[6]    The court also denied plaintiff's motion for entry of default against defendant Breslow, on February 16, 2016.

[7]    In case No. 7:14-CR-8-D in this district, defendant Breslow pleaded guilty to one count of false statement to the United States and aiding and abetting, in violation of 18 U.S.C. §§ 1001 and 2, and was sentenced on June 16, 2015, to a term of imprisonment of 30 months.  In case No. 7:14-CR-11-D, defendant Valdini Law Firm pleaded guilty to fraud relating to a major contract with the United States and aiding and abetting, in violation of 18 U.S.C. § 1031 and 2, and was sentenced on October 15, 2014, to a term of probation of 18 months.  In addition, in accordance with the government's settlement agreement in the instant case, Valdini Law Firm was ordered to pay the United States $30,000.00.

[8]    United States Magistrate Judge Kimberly A. Swank granted plaintiff's motion to file a second amended complaint over defendant's objection on July 12, 2017.  (See Order (DE 189)).  This court denied defendants' appeal of the same and affirmed the magistrate judge's order on December 12, 2017.  (See Order (DE 223)).

[9]    Plaintiff continues to assert claims against defendant Breslow and defendant Valdini Law Firm, but again with the caveat that Valdini Law Firm "has been released as to all claims, except for statutory attorneys' fees. (DE 190 at 8 n. 1).

Defendants filed an initial motion for summary judgment on January 23, 2018. Upon plaintiff's motion to strike the same, however, the court on September 25, 2019, denied without prejudice the initial motion for summary judgment, and granted in part and denied in part the motion to strike. The court reasoned that defendants had relied upon certain documents in support of summary judgment that they had failed to disclose in a timely and proper manner. (See Order (DE 257) at 4).[10] The court noted it "does not believe this particular violation is so egregious to rise to the level requiring total exclusion of these documents," but "in fairness to both parties, the court finds discovery should be re-opened in this matter for the limited purpose of allowing relator the opportunity to question witnesses regarding these late-disclosed documents, depose any witnesses who may have relevant information relating to these documents, and to utilize any other means of discovery deemed reasonably necessary by" the magistrate judge. (Id. at 5-6). The court directed the parties to confer in an attempt to resolve during the reopened discovery period additional disputed items subject of plaintiff's motion to strike. A period of reopened discovery followed, concluding February 7, 2020.

Defendants filed the instant motion for summary judgment on March 23, 2020, relying upon a statement of material facts and appendix including the following exhibits or categories of exhibits: 1) Affidavits of Cleetus E. McHenry ("McHenry"),[11] Chet Hailey ("Hailey"), Diana McGraw ("McGraw"), John Mac Caddell ("Caddell"), and Nathan Huff ("Huff"); 2) excerpts of depositions of plaintiff, Clint Bledsoe ("Bledsoe"), Joseph Canitano ("Canitano"), Richard Gurner

---

[10]     The subject documents were referenced in the court's order only as "Composite Exhibit C, App. 31-510," which, according to plaintiff, "go[] to a key issue in the case—materiality." (Order (DE 257) at 2, 4).

[11]     Appendix A to this order lists all the names of individuals referenced herein, and their positions during the relevant time period as portrayed in the record.

("Gurner"); McGraw, McHenry, and Valdini; 3) exhibits to affidavits and depositions, including correspondence between the parties, third parties, and the government; contract documents and submissions; including the following documents: a) "Subcontracting Plan for Small Business-Small Disadvantaged Business," dated August 11, 2008 (the "Subcontracting Plan") (App. 542-547);[12] b) "Contract Award" dated September 15, 2008 (the "Contract") (App. 548-601); c) "Caddell Yates Joint Venture Subcontract" with Pompano Masonry Corporation ("Pompano"), dated March 2, 2009 (the "Pompano subcontract") (App. 611-625); d) a letter from Valdini to McHenry, dated July 21, 2009, with "self-certification" (the "Valdini Self-Certification Letter") (App. 637); e) a letter from Tom Newton ("Newton") to Breslow, dated August 14, 2009, returning "one copy of our fully executed subcontract" (the "Breslow Construction" subcontract) (App. 643-658); f) individual subcontracting reports covering periods from contract inception to March 31, 2016 (App. 661-695); and 4) demonstrative charts prepared for litigation showing "Contract Billings, Payments, and Individual Subcontracting Reports [] Filings" and "Comparison/Contrast." (App. 1439-1443).

Plaintiff responded in opposition to the instant motion on May 20, 2020, relying upon an opposing statement of facts and appendix including the following exhibits or categories of exhibits: 1) plaintiff's declaration; 2) additional excerpts of depositions of the same deponents relied upon by defendants, as well as Sid Adams ("Adams"), William Barbee ("Barbee"), Del Buck ("Buck"), Reginald Foy, Jr. ("Foy"), Newton, Patsy Reeves ("Reeves"), John Mark Smith ("Smith"), Lisa Stokes ("Stokes"), Charles Tiefer ("Tiefer"), Frank Baker ("Baker"), and Robert Farmer ("Farmer"); 3) exhibits to affidavits and depositions, including correspondence between the

---

[12] Citations to "App.," when used, are to page numbers specified on the face of the parties' consecutively numbered appendix pages (filed at DE 273-274, 281-284, numbered App. 1 through App. 3033), and not to the page numbers designated by the court's case management and electronic case filing (CM/ECF) system.

5

parties, third parties, and the government; contract documents and submissions; including the following documents: a) an American Arbitration Association award (App. 1447-1462); b) expert witness reports of Barber and Tiefer (App. 1508-1568); c) Inspector General, Defense Criminal Investigative Service, report of agent interview of Smith, dated January 17, 2013 (App. 1569-1573); d) a United States Small Business Administration "Handbook for Small Business Liaison Officers," dated January 2005 (App. 1592-1672); e) United States Naval Criminal Investigative Service report of interviews with Vernon Ashley Walton ("Walton") and J.D. Patton ("Patton"), dated May 31, 2012 (App. 1768-1769); 4) subcontracts and related documentation produced in discovery by defendant Yates (App. 1770-2033); 5) transcripts of arraignment and sentencing of Breslow (App. 2829-2909); 6) reports captioned <u>Baker Roofing Company v. MPI Business Solutions and Caddell Yates</u>, "Preliminary Impact Analysis and Change Order Request" and <u>Precision Walls, Inc. v. MPI Business Solutions and Caddell Yates</u>, "Preliminary Impact Analysis and Claim for Damages" (App. 2918-3006); 7) excerpts from Application and Certification for Payment forms, from Caddell Yates Joint Venture to Naval Facilities Engineering Command Mid-Atlantic ("NAVFAC") (App. 3013-3033).

Defendants replied on June 17, 2020, relying upon an opposing statement of material facts and an exhibit comprising plaintiff's designation of expert reports. With leave of court, plaintiff filed a surreply on July 22, 2020, relying on excerpts of a deposition of Larry A. Hinson ("Hinson").[13] Defendant filed a response thereto on August 19, 2020, and plaintiff filed a sur-surreply on September 2, 2020.

---

[13] Plaintiff's surreply originally was styled as including a motion to strike defendants' reply statement of material facts. On February 1, 2021, after the matter was reassigned to the undersigned, the court granted plaintiff's alternative motion for leave to file surreply, stating that the court will consider briefing thereon in consideration of defendants' motion for summary judgment.

6

## STATEMENT OF FACTS

The undisputed facts may be summarized as follows. Defendants are general-commercial construction companies based in Alabama and Mississippi, respectively. (Defs' Stmt. (DE 272) ¶ 1).[14] Both defendants serve as general contractors for federal and commercial projects. (Id.). In 2008, defendants formed a joint venture to submit a proposal to NAVFAC for design and construction of the Wallace Creek Regimental Complex at the Marine Corps Base Camp Lejeune in Jacksonville, North Carolina. (Id. ¶ 2). This project included site clearing and grubbing of raw land, grading and drainage, and construction of more than 20 buildings to serve and house approximately 3,000 Marines at Camp Lejeune (the "Project"). (Id. ¶ 3).

On September 15, 2008, NAVFAC awarded the Project to defendants in a $181,882,000 "firm fixed price contract" (the "Contract"). (Id. ¶ 4; App. 576).[15] The Contract includes numerous design requirements, environmental and quality control expectations, safety and security parameters, hazardous material restrictions and waste management planning, with detailed processes prescribed for regular design and construction approval as work progresses. (Defs' Stmt. ¶ 5; App. 548-601). The Contract specifies mandatory performance completion in 1095 days (3 years). (Defs' Stmt. ¶ 6; App. 549). The Contract sets out a "Description of Work," including the following:

> This is a Design/Build to provide the design and construction of three FY07 projects and three FY08 projects, consisting of 20 new structures comprising nearly 570,000/square feet. These projects will construct the necessary administrative headquarters, operation, maintenance, and mission support, training and housing facilities to support 3000+ Marines to be stationed at Wallace Creek. . . . The contractor shall provide all labor, supervision, engineering, materials, equipment,

---

[14] Pursuant to Local Rule 56.1(a)(2), the court cites to paragraphs in defendant's statement of facts, or portions of such paragraphs, where not "specifically controverted by a correspondingly numbered paragraph in the opposing statement" of plaintiff.

[15] In Contract documents and records quoted herein the term "Contractor" refers to the Caddell/Yates joint venture, which the court designates for purposes of this order as "defendants," for ease of reference.

7

tools, parts, supplies and transportation to perform all of the services described in the plans and specifications.

(Defs' Stmt. ¶ 8; App. 551).

The Contract incorporates "by reference" 104 separate provisions of the Federal Acquisition Regulations ("FAR"), which document a wide range of government contracting preferences, goals, and rules. (App. 577-579; see 48 C.F.R. §§ 53.203-3 to 252.243-7002, also referenced as FAR 53.203-3 to 252.243-7002). For example, such incorporated FAR provisions include but are not limited to "Combatting Trafficking in Persons" (FAR 52.222-50), "Drug Free Workplace" (FAR 52.223-6), "Accident Prevention" (FAR 52.236-13), "Display of DOD Hotline Poster" (FAR 252.203-7002), and "Preference for Certain Domestic Commodities" (FAR 252.225-7012). (App. 577-579).

The Contract also incorporates "by full text" 20 FAR provisions, including, for example, "Buy American Act – Construction Materials Under Trade Agreements" (FAR 52.225-11), "Performance of Work by the Contractor" (FAR 52.236-1), "Organizational Conflicts of Interest," (FAR 52.209-9300), and "Accident Prevention" (FAR 52.236-9303). Among the provisions referenced and incorporated "are a number of ancillary requirements that implement various socio-economic programs," including "small business subcontracting plan, various labor laws, and working conditions." (Defs' Stmt. ¶ 9).

As pertinent to the analysis herein, the court summarizes, in turn below, incorporated FAR provisions of the Contract related to payment, and those related to small business subcontracting. With respect to each, the court summarizes defendants' performance, followed by further details regarding the subcontracts at issue in plaintiff's claims.

8

A.      Payment

The Contract incorporates FAR 52.232-5, which provides that "[t]he Government shall pay the Contractor the contract price as provided in this contract."  FAR 52.232-5(a).[16]  It further provides that "[t]he Government shall make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contracting Officer,[17] on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer."  FAR 52.232-5(b).  The Contractor's request for progress payments must "include the following substantiation" –

(i) An itemization of the amounts requested, related to the various elements of work required by the contract covered by the payment requested.

(ii) A listing of the amount included for work performed by each subcontractor under the contract.

(iii) A listing of the total amount of each subcontract under the contract.

(iv) A listing of the amounts previously paid to each such subcontractor under the contract.

(v) Additional supporting data in a form and detail required by the Contracting Officer.

FAR 52.232-5(b)(1).  In addition, "[a]long with each request for progress payments, the Contractor shall furnish the following certification, or payment shall not be made" –

I hereby certify, to the best of my knowledge and belief, that—

(1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;

(2) All payments due to subcontractors and suppliers from previous payments received under the contract have been made, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with

---

[16]     All citations to this FAR are to the September 2002 version as specified in the Contract.  (App. 578).

[17]     The Contracting Officer is "a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings" for the government. FAR 2.101.

9

subcontract agreements and the requirements of chapter 39 of Title 31, United States Code; [and]

(3) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract[.][18]

FAR 52.232-5(c).  Further, "if satisfactory progress has not been made, the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved."  FAR 52.232-5(e).

Also incorporated into the contract are provisions for "Inspection of Construction," which provides that "[t]he Contractor shall maintain an adequate inspection system and perform such inspections as will ensure that the work performed under the contract conforms to contract requirements," and "[a]ll work shall be conducted under the general direction of the Contracting Officer and is subject to Government inspection and test at all places and at all reasonable times before acceptance to ensure strict compliance with the terms of the contract."  FAR 52.246-12(b).[19] Likewise, "the Contractor warrants . . . that work performed under this contract conforms to the contract requirements and is free of any defect in equipment, material, or design furnished, or workmanship performed."  FAR 52.246-21(a).

Defendants submitted monthly progress payment requests to NAVFAC from November 2008 through November 2011, on a form incorporating the language and certification set forth in the FAR. (Defs' Stmt. ¶ 143; e.g., App. 3013-3019).  The actual payment requests submitted to the government are in the form of both a "payment certificate," tracking exactly the FAR 52.232-5(c) language as quoted above, as well as an "application for payment" that sets forth an additional

---

[18]        A fourth paragraph in the certification is optional.

[19]        "Work" is defined to include "materials, workmanship, and manufacture and fabrication of components." FAR 52.246-12(a).

certification stating: "to the best of the Contractor's knowledge, information, and belief, the work covered by this Application for Payment has been completed in accordance with the Contract Documents." (E.g., App. 3013).[20] A "continuation sheet" to each submission includes a table showing "Description of Work" "Work Completed" and "Balance to Finish." (E.g., App. 22, 3015). In this manner, defendants submitted additional payment requests in March and September of 2012, an additional request in January 2015, and a final request in January 2016. (Defs' Stmt. ¶ 143; e.g., App. 21-28, 3020-3033). In all, defendants submitted 40 payment requests. (Defs' Stmt. ¶ 143).

"During performance, NAVFAC amended the Contract through 44 contract Modifications. These Modifications resulted in a final contract value of $194,731,380.97 at completion in late 2011." (Defs' Stmt. ¶ 7). The government paid all monthly progress payment requests made by defendants throughout construction of the Project. (Defs' Stmt. ¶ 150). These included payments on 36 monthly progress payment requests between December 2008 and November 2011, totaling approximately $185,245,897.00, plus two additional payments on requests made in April 2012, and November 2012, totaling approximately $9,334,584.00, and two final payments in March 2015 and March 2016, totaling approximately $150,900.00. (See id.; App. 1439-1440).

On March 12, 2012, Patton, the government's project manager for NAVFAC, issued the Final Performance Evaluation Report for the Project. (Defs' Stmt. ¶ 176). The government rated defendants' overall contract performance as "Outstanding," the highest rating allowed. (Id.). The government rated all performance elements as satisfactory or above. (Id.). The narrative remarks by the government stated:

---

[20]    An additional page with a "QC Invoice Certification" similarly provides that "[a]s-built drawings are current, and the work for which this payment is requested, including stored material, are in compliance with contract requirements." (E.g. App. 3033; McHenry Aff. ¶10 (App. 3)).

This project was very complex and had a high level of construction risk. Overall, [defendants] did an outstanding job of managing this complexity and risk. They established and maintained a good working relationship between the project team and the government. The project team was focused on customer satisfaction. All contract changes were handled professionally and all challenges were dealt with promptly. [Defendants] also maintained an impressive safety and environmental record throughout the project duration. This project was located in an environmentally sensitive area and great care was taken to ensure that there was no construction related environmental impact. [Defendants] completed over 2 MILLION man-hours of labor on this project without a lost time accident. This is an impressive accomplishment and this office would gladly work with [defendants] on projects.

(Id.). The barracks constructed by defendants are still being used to house approximately 3,000 Marines at Camp Lejeune. (Defs' Stmt. ¶ 192).

Since 2012, the federal government has awarded more than 35 construction contracts to Caddell, including approximately 17 projects since the government decided not to intervene in this case as to defendants in July 2014. (Defs' Stmt. ¶ 193). Since March 2012, the federal government has awarded seven construction projects to Yates. These seven construction projects include a NAVFAC contract awarded to a joint venture in which Yates is one of two partners. (Defs' Stmt. ¶ 194).

B.     Small Business Subcontracting

The contract incorporates FAR 52.219-8, "Utilization of small business concerns," which provides: "[t]he Contractor hereby agrees to carry out this policy" that small businesses "shall have the maximum practicable opportunity to participate in performing contracts" "to the fullest extent consistent with efficient contract performance." FAR 52.219-8(a)-(b). "Contractors acting in good faith may rely on written representations by their subcontractors regarding their status as a small business concern." FAR 52.219-8(d).

The Contract further incorporates FAR 52.219-9, which requires the "offeror, upon request by the Contracting Officer, [to] submit and negotiate a subcontracting plan," which must include

"[a] statement of – . . . Total dollars planned to be subcontracted to small business concerns . . . ." FAR 52.219-9(c), (d)(2). A "Subcontracting Plan for Small Business/Small Disadvantaged Business" (the "Subcontracting Plan"), dated August 11, 2008, was part of defendants' proposal submitted in response to the government's solicitation (request for proposal), and incorporated into the Contract upon award. (Defs' Stmt. ¶ 15; App. 542).

The Subcontracting Plan includes "targets . . . proposed for the total contract," comprising 77 % of total planned subcontracting dollars to small businesses and 14 % of total planned subcontracting dollars to subcontractors qualifying under the "Women-Owned Small Business" criteria established by the United States Small Business Administration. (Defs' Stmt. ¶ 17; App. 542-543). The Subcontracting Plan states: "The original copy of this plan is included in the file and made a material part of the contract." (Defs' Stmt. App. 547). It provides that Gurner, a Yates estimator, "will administer the subcontracting program." (App. 544).[21]

During the "entire life of the contract," the Contractor must "[s]ubmit periodic reports so that the Government can determine the extent of compliance by the [Contractor] with the subcontracting plan," including, as pertinent here, "Standard Form (SF) 294, Subcontracting Report for Individual Contracts," also known as Individual Subcontracting Reports or "ISRs". FAR 52.219-9(d)(10)(ii)-(iii). Such reports must be submitted to the government contracting officer twice per year for the six month period ending March 31 and September 31, respectively. (Defs' Stmt. ¶ 13; App. 546).

In April 2009, defendants began submitting individual subcontracting reports. (Defs' Stmt. ¶ 126). These reports do not request payment of any funds. (Id. ¶ 127). The first individual subcontracting report submitted by defendants was for the reporting period ending March 31, 2009.

---

[21]      McHenry replaced Gurner as the small business subcontracting plan administrator on the Project after the design phase of the Project ended and Gurner moved on to other projects. (Defs' Stmt. ¶ 36).

13

That report showed no small business subcontracting at all. (Id. ¶ 128). An individual subcontracting report is due even where there has been no subcontracting at all. (Id.).

After the first individual subcontracting report, defendants submitted individual subcontracting reports via the government's electronic subcontracting reporting system. (Id. ¶ 129). The individual subcontracting reports provide information regarding the total cumulative subcontract award amounts by size (large/small) of business and socio-economic classification of small businesses. (Id. ¶ 130). Defendants' individual subcontracting reports were calculated and reported on a "commitment basis." (Id. ¶ 131). That means the total subcontract amount is captured for individual subcontracting report calculations "when you [Caddell-Yates] execute the subcontract award documents." (Id.).

The individual subcontracting reports submitted prior to 2014 do not identify any subcontractors. (Id. ¶ 132). Similarly, none of those reports identify any particular subcontract amount, identify which subcontractors actually performed work, or reflect the performance of work. (Id. ¶¶ 132, 137). Instead, they report the total cumulative of all subcontracts by size and by each socio-economic category. (Id.). They only report "Subcontract Award" dollars, and thus do not consider the prime contractor's self-performance portion of the total contract amount. (Id.).

McGraw, a marketing coordinator for Yates, prepared the individual subcontracting reports for the Contract, and consulted with McHenry, defendants' project executive, when drafting them. (Id. ¶¶ 105, 133). A small-business subcontract award (total subcontract amount) would be included in calculating the overall small business goal as well as each socio-economic classification, such as women-owned small business, applicable to the small business. (Id. ¶ 134). Thus, the total award amount of a particular small-business subcontractor would be included in

14

calculating not only the overall cumulative small business subcontracting achievement, but also the achievement for each socio-economic category for which such small business qualified. (Id.).

To gather information to prepare the individual subcontracting reports, McGraw required each subcontractor to deliver to her a form styled "Small Business Concern Self-Certification." (Pl's Stmt. (DE 106) ¶ 106). The form requires a subcontractor to indicate any socio-economic classifications applicable, and to "acknowledge[] that Caddell Yates Joint Venture will rely on the accuracy of the information." (App. 797). It also included a warning that "[u]nder 15 U.S.C. 645(d), any person who misrepresents its status may be subject to" criminal sanctions. (Id.; McGraw Dep. 147 (App. 1339)).

Defendants submitted 14 individual subcontracting reports for the Project. (Defs' Stmt. ¶ 135). Each individual subcontracting report contains a "certification" that it is accurate. (Id. ¶ 136; e.g., App. 664). Electronically filed individual subcontracting reports are certified as accurate at time of submission. (Id.). "This is a testament that the data being submitted on the report is accurate and that the dollars and percentages reported do not include lower tier subcontracts." (App. 994; see McGraw Dep. 151 (App. 1342)). If the contractor selects "No" to this certification, the "report will be rejected." (Id.).

While all pre-2014 individual subcontracting reports show that defendants were achieving greater than 77% overall small business contracting percentage, those 2014 and later show that defendants achieved a 68% overall small business subcontracting percentage. (Defs' Stmt. ¶ 141; App. 661-695). Thus, at the completion of the contract, defendants had not achieved the 77% overall small business subcontracting goal in its Subcontracting Plan. (Id.). Defendants included the following remarks in their March 31, 2014, individual subcontracting report:

> [Defendants] made significant efforts to meet the small business utilization goals for this project, resulting in $79,866,933 dollars in small business subcontracting.

15

However, Breslow Construction has been reclassified as a large business based upon information obtained from public filings since the last reporting period. Due to this reclassification, we no longer meet one of our goals – Small Business Concerns.

(App. 684). Similar remarks follow in the remainder of individual subcontracting report submitted for 2014 and 2015. (App. 687, 690, 693).

On October 15, 2015, the contracting officer for NAVFAC informed defendants via letter it had reviewed the April 2015 individual subcontracting report and requested "information on how your company is making a good faith effort to comply with the subcontracting plan." (Defs' Stmt. ¶ 182; App. 2034). In the letter, NAVFAC warned defendants the government could assess liquidated damages pursuant to FAR 52.219-16 in the amount of $6,486,761.00. (Defs' Stmt. ¶ 183). In response, defendants provided a "Narrative of Good Faith Efforts" to the contracting officer for NAVFAC. (Id. ¶ 184). The Narrative of Good Faith Efforts references the criminal cases against Breslow and the Valdini Law Firm, which were then a matter of public record. (Id. ¶ 185). At the time, the instant action had been unsealed and was also a matter of public record. (Id.).

On November 4, 2016, the contracting officer for NAVFAC filed a contract completion statement that noted all purchasing office actions were fully and satisfactorily accomplished and closed NAVFAC's contract file regarding the project. (Id. ¶ 188). The contract completion statement was signed by the same NAVFAC contracting officer to whom the Narrative of Good Faith Efforts had been submitted. (Id. ¶ 189). NAVFAC did not pursue liquidated damages against defendants. (Id. ¶ 190).

16

C.     Subcontract Details

1.     Pompano and Breslow Construction

Plaintiff is a former estimator and president of operations for Pompano. (Id. ¶ 21). At all times relevant to this case until its dissolution in 2013, Pompano was a large masonry company headquartered in Pompano Beach, Florida. (Id. ¶ 22). Pompano had an office in Charlotte, North Carolina, where plaintiff was based. (Id.).

The Julian Marie Breslow Revocable Living Trust Agreement (the "Breslow Trust") purchased Pompano in 2007. (Id. ¶ 23). On January 16, 2009, plaintiff, on behalf of Pompano, submitted a bid of $13,245,739.00 to perform the masonry work on the Project. (Id. ¶ 24). On February 6, 2009, plaintiff stated in an email to Gurner that Steven Siegel ("Siegel") purchased Pompano in April 2007. (Id. ¶ 25). His email attached an undated page listing the following "principals" of Pompano:

> [Breslow] – Director/Chairman
> [Siegel] – Director/President
> Jillian Breslow – Director/Vice President
> Michael Ridgway ("Ridgway") – Director/Treasurer
> [Canitano] – Vice President/N.C. Operations
> Timothy Carroll ("Carroll") – Vice President/Maryland Operations

(Id.).

In February 2009, defendants met with plaintiff and Canitano in Mississippi to discuss the masonry work on the Project. (Id. ¶ 26). This was the only trip plaintiff or Canitano made to Mississippi regarding the Project. (Id.). Around February 24, 2009, plaintiffs decided to use Pompano for the masonry work on the Project. (Id. ¶ 28).

On February 24, 2009, Canitano informed McHenry that Pompano's attorney was reviewing a proposed subcontract. Pompano's attorney was Valdini, who had his own firm, the Valdini Law Firm, located in Fort Lauderdale, Florida. (Id. ¶ 30). The Valdini Law Firm website

17

stated: "The firm handles . . . statutory compliance" for construction clients. (Id. ¶ 31). The Valdini Law Firm promoted its "extensive experience helping (construction) companies deal with government contract regulations." (Id.). The site reflected Valdini had an "AV" peer rating by Martindale-Hubbell. (Id.). Valdini had handled the sale of Pompano to the Breslow Trust in 2007 and thereafter continued to represent Pompano. (Id. ¶ 32). On February 24, 2009, Valdini reviewed the proposed subcontract and advised Canitano about it in a telephone conference. (Id. ¶ 33).

Canitano executed the Pompano subcontract, which bears a date on its face of March 2, 2009, with a scope of work including "[c]omplete turnkey masonry package for all structures" in the Project, and a subcontract amount of $14,438,493.00. (App. 611-625).

On April 27, 2009, Dick Fitzgibbons ("Fitzgibbons"), a vice president and estimator for Yates, emailed other employees of defendants about the "Small Business goals" for the Project, noting "here is my blueprint for reaching the 77% small business goal." (App. 659). Among other items, Fitzgibbons noted the "present contract" with Pompano comprised "about 15.2 mil [large business] with the recent additions," and he stated, for Pompano, "They need to buy materials through a minority like First Construction or MPI. Also, they need to find a minority that they can subcontract some work to." (Id.).

On May 5, 2009, McHenry emailed Newton and Bledsoe stating: "Mark [Smith] brought me Pompano's contract today. He wants to discuss the SBP [small business plan] before executing." (App. 1495). Smith directed McHenry to hold onto the Pompano subcontract while defendants determined whether they would need to break up the Pompano subcontract to contract directly with Pompano's small business subcontractors and/or material suppliers to increase defendants' small business subcontracting. (Defs' Stmt. ¶ 36). In May 2009, Pompano began

18

performing masonry work on the Project and, by late July 2009, it had submitted two payment requests to defendants. (Id. ¶ 37).

Also in May 2009, Breslow decided to create a women-owned small business in order to obtain preferences for additional masonry business on federal, state, and local projects. (Defs' Stmt. ¶ 59; see App. 934). On May 27, 2009, Valdini conferred with Breslow and Ridgway (Pompano's chief financial officer) regarding "minority and small business certification." (Defs' Stmt. ¶ 61). Breslow and Ridgway did not mention the Project or defendants during this conference. (Id. ¶ 62). In the first few days of June 2009, Valdini and an associate at the Valdini Firm, Elaine Parris ("Parris"), assisted Breslow in creating a small business that became Breslow Construction, LLC ("Breslow Construction"). (Id. ¶ 63).

On June 3, 2009, Parris called Breslow about a small-business application and Parris reviewed a Broward County, Florida, Small Business Application form. (Id. ¶ 64). By June 3, 2009, Ridgway and the lawyers were considering several names for the new women-owned small business. (Id.). On June 4, 2009, after determining several alternative names were not available, they agreed to "set up the new company as Breslow Construction." (Id. ¶ 65). On June 9, 2009, Parris prepared the Articles of Organization and Operating Agreement for Breslow Construction, LLC. (Id.). On that day, Parris also prepared an IRS form to obtain an EIN for Breslow Construction. (Id. ¶ 66).

In June 2009, McHenry met with plaintiff and Canitano in a trailer onsite at Camp Lejeune to discuss defendants' need for their help to increase small business subcontracting participation. (Defs' Stmt. ¶ 69). According to plaintiff, McHenry stated to plaintiff and Canitano, "We're having . . . problems with small business participation . . . . Is there anything that your company can do?" or "[Y]our people in Florida, anything they can do?" (App. 2608, 2611). Canitano asked,

19

"[r]egarding what?" then McHenry further stated: "The going rate is one or two percent," or "It pays – you know it's two, three percent." (App. 2611). Canitano then stated: "I don't know about that. I need to talk to the people in Florida," referring to his managers headquartered in Florida. (App. 2608-2609).

On June 11, 2009, Fitzgibbons emailed McHenry, Bledsoe, Gurner, and Smith, regarding the "Small Business Plan" for the Project, stating: "Guys right now, for small business, I think that we are in the 46% to 47% range." (App. 1497). He noted "Pompano Masonry" as one of their "large business contracts," among other contracts totaling about $51,931,000.00, and that "[i]n order for [defendants] to make the [Small Business] goal of 77%, half of the above dollars, or about 26 million has to come out of these contracts and go to small business." (App. 1497).

On July 2, 2009, Canitano had a telephone conference with Parris "regarding Breslow Construction." The billings show that Parris then prepared an "Application for Small Business Certification." (Defs' Stmt. ¶ 78). The same Valdini Firm billings show that on July 9, 2009, Parris, Valdini, and Canitano had a telephone conference "regarding DBE [Disadvantaged Business Enterprise] qualifications for Breslow Construction." (Id. ¶ 79).

On July 10, 2009, Bledsoe informed Adams, a construction Manager for Caddell, by email that:

> [Pompano] called me yesterday [July 9, 2009] about possibly running their entire contract through a [women-owned small business] that they are setting up. They are discussing this with their lawyers and should let me know something by Monday or Tuesday of next week. This should help out with the cost of obtaining our small business goals.

(Id. ¶ 80). Relator or Canitano made the call to Bledsoe referenced in his July 10, 2009, email to Adams. (Id. ¶ 81).

In mid-July 2009, the Valdini Law Firm prepared a "Certificate of Authority" for Breslow Construction to do business in North Carolina. (Id. ¶ 83). Plaintiff knew that defendants had

20

requested a "letter from the attorney." (Id. ¶ 84). According to plaintiff, Canitano told him: "Now Cleet [McHenry] wants something from the damn attorney saying its okay." (Id.). Canitano told plaintiff he suggested McHenry have his attorney "talk to our counsel . . . to get the right thing." (Id.). Canitano told plaintiff that McHenry "wanted—his people, being Yates Construction, wanted additional protection." (Id.).

Plaintiff has no personal knowledge of any communications between McHenry, Bledsoe, or anyone at Yates and Breslow or Siegel. (Id. ¶ 85). Relator testified: "I don't know of any of these parties talking personally." (Id.).

On July 17, 2009, Canitano emailed McHenry, copying Valdini, stating: "Per our conversation, I think it is a good idea to have our Attorney contact your council [sic] in regards to our Small Business Certification. We want to make sure we are applying for correct type that benefits your project needs." (App. 635). McHenry then contacted a Yates in-house counsel who suggested he call McGraw, who assisted Yates project managers with small-business matters. (Defs' Stmt. ¶ 87). Later that same day, McGraw emailed Canitano, copying McHenry, stating:

> To meet the requirements of this project – small business women owned business, you will need to provide Cleet [McHenry] with a self certification. This self certification is a letter stating that you are in fact a small business and that you are women owned (more than 50% women owned). . . . Per your request, I have included several references for you.

(Id.). McGraw then provided links to the Small Business Administration, and she quoted FAR 19.703(b),[22] and provided a link to the FAR. (Id.).

On July 21, 2009, Valdini sent the Valdini Self-Certification Letter to McHenry, which stated:

---

[22]     The FAR in effect at the time provided, in pertinent part, that "a contractor acting in good faith may rely on the written representation of its subcontractor regarding the subcontractor's status as a . . . . woman-owned small business concern." 48 C.F.R. 19.703(b) (2008).

21

Re:    Breslow Construction, LLC.
       Project: Wallace Creek

Dear Mr. McHenry:

This law firm represents Breslow Construction LLC. Please be advised that Breslow Construction, LLC. is more than 51% women-owned. Breslow Construction, LLC. is a small business and its average annual receipts are less than $14 million. Enclosed please find the corporate documents for Breslow Construction, LLC. Please allow this correspondence to serve as Breslow Construction, LLC.'s self- certification and its intent to be considered for the above-referenced project.

(Defs' Stmt. ¶ 90; App. 637). This letter attached the articles of organization for Breslow Construction, which list the managing members as Breslow, Jillian Breslow, and Lauren Breslow. (Id.). The letterhead of the Valdini Self-Certification Letter noted Valdini was "Florida Bar Board Certified in Construction Law." (Id. ¶ 91).

The Valdini Self-Certification Letter and McGraw's call with Parris are the only communications between defendants and the Valdini Firm regarding Valdini's certification of Breslow Construction as a women-owned small business. (Id. ¶ 94). McHenry had no recollection of ever speaking to Valdini or anyone at his firm. (Id.). Plaintiff had no knowledge of any communication between McHenry and Valdini, Parris, or anyone else at the Valdini Firm. (Id. ¶ 95).

On July 23, 2009, Canitano e-mailed Bledsoe: "Here is a copy of the schedule that we all agreed to. Please use this as your template for the new contract for Breslow Construction LLC. I assume you will be adding the 2% fee to our current contract amount of $14,438,493. The revised amount is $14,727,262." (App. 642).

In response to Canitano's e-mail, Bledsoe obtained a copy of the final Pompano subcontract, which had been signed and placed on hold by Smith. (Defs' Stmt. ¶ 98). Bledsoe e-mailed this contract to both Canitano and plaintiff and wrote: "Here is contract you signed. I need

22

you to mark your changes on this contract so I can put them on the new contract for Breslow."
(Id.).

Smith and Bledsoe were involved in negotiating a final subcontract price with Breslow Construction. (Id. ¶ 101).They agreed to increase the contract price by a 2% fee. (Id.). Also, they agreed to eliminate from the scope of work the obligation to maintain the worksite in return for a $25,000 bulldozer deduction. (Id.).

On August 14, 2009, defendants returned a fully executed subcontract between defendants and Breslow Construction bearing the typed date March 2, 2009 (the "Breslow Construction subcontract"). (Id. ¶ 102; App. 643-58). The amount of the final Breslow Construction subcontract was 2% higher than the Pompano subcontract, less the $25,000 bulldozer deduction. (Defs' Stmt. ¶ 102).

On August 19, 2009, Canitano wrote to Breslow and Ridgway, who was chief financial officer of Pompano, that defendants "will not have any problems with Breslow subbing to Pompano. They do want some site supervision under Breslow's people on the payroll." (Id. ¶ 103). Breslow Construction listed Pompano as a lower-tier subcontractor in its pay request. (Id.). Plaintiff acknowledged the subcontract required an onsite representative. (Id. ¶ 104). Plaintiff hired an onsite safety officer for Breslow Construction. (Id.).

McGraw first heard the name Breslow Construction when she was preparing the individual subcontracting report for the period ending September 30, 2009. (Defs' Stmt. ¶ 107). On October 7, 2009, Ridgway completed a "Small Business Concern Self-Certification," certifying Breslow Construction as a women-owned small business (hereinafter, the "Ridgway Self-Certification Letter") (Id. ¶ 108; App. 797). McGraw relied upon Ridgway's self-certification that Breslow Construction was a women-owned small business in preparing the individual subcontracting

reports that included Breslow Construction subcontract amounts in its percentages and totals. (McGraw Dep. 149 (App. 1341).

2. Pass-through Subcontracts

Defendants subcontracted with five small businesses—First Construction Co., Inc. ("First Construction"), MPi Business Solutions ("MPi"), Power Mulch Systems, Inc. ("Power Mulch"), Bailey Contracting, Inc. ("Bailey"), and S&L Painting & Decorating, Inc. ("S&L Painting") (collectively, the "first-tier small businesses")—that further subcontracted the work to large businesses. (Defs' Stmt. ¶ 52).

Each of the first-tier small businesses received 1% to 2% of the value of work further subcontracted as compensation for their role in contracting with defendants. (Id. ¶ 54). These first-tier small businesses did not "perform[] the actual labor and work," but rather "would be doing the billings and . . . have a representative on site for those contracts." (App. 1359-1360).

In one instance, for example, Power Mulch did "the Invoicing . . . for 1% of the invoice value plus an amount not to exceed $40,000.00 to keep an individual on site to represent [Power Mulch]." (App. 1482). A subcontract with defendants, dated June 5, 2009, provided for Power Mulch to work on a "cored slab bridge" on the Project, and it allotted a payment of $3,333.33 per month for "subcontractor's onsite personnel," not to exceed $40,000.00 per year, plus approximately 1% of the $858,764.00 subcontract fee going to Power Mulch, and the remaining amount to be "joint checked to S.T. Wooten." (App. 1673-1675). That same day, Power Mulch further subcontracted with S.T. Wooten for the same scope of work on the bridge. (App. 1919).

In another example, a subcontract with defendants, dated June 12, 2009, provided for Bailey Construction to work on "mechanical and plumbing work" on the Project, for a total subcontract amount of $27,090,350.00, with approximately 1.5% less, or $26,690,000.00, of that

24

subcontract fee to be "joint checked to John J. Kirlin." (App. 1861-1862). McHenry explained the arrangement in an email the previous day, stating: "I talked to Kirlin this morning and it looks like we can send their entire contract through Bailey for 1.5%. The 1% is to Bailey and the .5% is to cover the cost of paying Bailey's supervisor on site." (App. 1497).

In summary, the pass-through entity subcontracts that are subject of the instant action include the following, according to plaintiff's declaration:

| "Pass Through" Entity | Large Business Actually Performing Contract | Trade | Amount |
|---|---|---|---|
| First Construction | | | |
| | C.H. Edwards | Door/HDW Supplier | $1,841,629 |
| | ABG Waterproofing | Joint Sealants | $  691,000 |
| | Stark Steel | Metal Roof Trusses | $1,664,690 |
| MPi Business Solution | | | |
| | Precision Walls | Metal Studs/ Drywall | $2,673,344 |
| | McComb Glass | Glass/Glazing | $2,405,197 |
| | Baker Roofing | S.S. Metal Roofing | $3,394,920 |
| Power Mulch | | | |
| | Hawk | Food Service | $1,421,379 |
| | S.T. Wooten | Bridge | $  858,764 |
| | B.R. McMillan | Specialties | $  929,641 |
| | Woodsystems | Millwork | $1,509,406 |
| Bailey Contracting | | | |
| | J.J. Kirlin | Mechanical | $27,090,350 |
| S&L Painting | | | |
| | Southeastern Interior | Flooring Systems | $2,664,522 |

(App. 2195).

Additional facts will be discussed in the analysis herein.

## COURT'S DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached

26

exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.    Analysis

1.    False Claims Act

Plaintiff's first three claims are based upon submission of false claims and false statements to the government in violation of the False Claims Act, 31 U.S.C. § 3729(a). That statute provides liability, in pertinent part, for:

any person who--

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(C) conspires to commit a violation of subparagraph (A) [or] (B).

31 U.S.C. § 3729(a).

"To state a claim under the FCA, the plaintiff must prove: (1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was

27

made or carried out with the requisite scienter; (3) the statement or conduct was material; and (4) the statement or conduct caused the government to pay out money or to forfeit money due." United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 913 (4th Cir. 2003) ("Harrison II"). [23]

The court begins its analysis by addressing the element of a false claim for payment, then turns to the elements of materiality and scienter.

        a.       False Claim for Payment

"All FCA claims require, among other elements, that the false statement or conduct caused the government to pay out money or to forfeit money due." United States ex rel. Grant v. United Airlines Inc., 912 F.3d 190, 196 (4th Cir. 2018). "In order for a false statement to be actionable under either subsection of the FCA [§§ 3729(a)(1)(A) or (B)], it must be made as part of a false or fraudulent claim." Id. "The statute attaches liability not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" Id. "A 'claim' is 'any request or demand, whether under a contract or otherwise, for money or property that . . . is presented to an officer, employee, or agent of the United States.'" Id. (quoting 31 U.S.C. § 3729(b)(2)(A)). "Therefore, a central question in all FCA cases is whether the defendant ever presented a false or fraudulent claim to the government, resulting in a call upon the government fisc." Id.

Plaintiff's claims are premised on the assertion that defendants "made express and/or implied false certifications that [each] was complying in good faith with its Subcontracting Plan and FAR 52.219-8" in their individual subcontracting reports and their monthly progress payment requests, when in fact they were not complying because Breslow Construction and other pass

---

[23]     In all citations to cases in this order, internal quotation marks and citations are omitted unless otherwise specified.

28

throughs were not qualifying small business subcontractors. (Am. Compl. ¶¶ 173-177, 243, 247-248). Plaintiff's claims fail as a matter of law, however, because the certifications defendants made in their individual subcontracting reports were not claims for payment, and defendants did not make the asserted false certifications in their monthly progress payment requests. Finally, plaintiff fails to meet the requirements of an implied false certification. The court addresses each theory in turn below.

i.      Individual Subcontracting Reports

Each individual subcontracting report submitted by defendants contains a "certification" that it is "accurate." (E.g., App. 664, 994). That certification, even if a false statement, is not actionable under the FCA because it is not part of a "claim for payment." Grant, 912 F.3d at 196. The individual subcontracting reports are not a "request or demand, whether under a contract or otherwise, for money or property that . . . is presented to an officer, employee, or agent of the United States." Id. (quoting 31 U.S.C. § 3729(b)(2)(A)). It is undisputed that the individual subcontracting reports do not themselves seek a payment of money. (Defs' Stmt. ¶ 127). They also are not submitted as part of the monthly progress payment requests through which defendants sought payment for their work under the Contract. (Defs' Stmt. ¶ 135; see Appendix B).

Plaintiff argues nonetheless that the individual subcontracting reports constitute claims for payment because they are "related" to the claims for payment made in the monthly progress payment requests, and because both relate to the same contract. (Pl's Mem. (DE 286) at 8).[24] The standard, however, is not whether statements made to the government are related to a claim for payment or related to the same contract upon which payment is sought, but rather whether the

_____

[24]      For briefs and other documents identified by a docket entry ("DE") number, page numbers in citations are to the page number provided by the court's case management/electronic case filing ("CM/ECF") system, rather than the page number, if any, shown on the face of the document.

statements are "made as part of a false or fraudulent claim." Grant, 912 F.3d at 196 (emphasis added).

Plaintiff cites to United States v. Family Medical Centers of S.C., LLC, No. CV 3:14-382-MBS, 2016 WL 6601017 (D.S.C. Nov. 8, 2016), as an example of a case where the government proceeded on a theory of "express certification," where a defendant physician "executed multiple certification statements in Section 15 of Form CMS-855B indicating that he would adhere to the requirements of Medicare laws, regulations, and program instructions, including, but not limited to, the Stark Law." Id. *3. But the court in Family Medical Centers did not undertake any analysis of the manner in which a claim there was presented for payment, and there is no discussion in the opinion regarding the language in "Section 15 of Form CMS-855B" concerning payment or requests for payment. See id. *2-3. Therefore, Family Medical Centers is not helpful to the instant analysis.

Plaintiff also argues that the court in Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 787 (4th Cir. 1999) ("Harrison I"), "endorses a fraudulent inducement theory of FCA liability, which by its very terms allows a claim of express false certification where that certification is not made with the claim for payment, but well before." (Pl's Sur-Surreply (DE 306) at 7). This is not what Harrison I says. Rather, Harrison I recognized that under a "fraud-in-the-inducement" theory, courts have "found False Claims Act liability for each claim submitted to the government under a contract, when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct." Harrison I, 176 F.3d at 787 (emphasis added). As an initial matter, this theory reinforces, rather than undermines, the key requirement that the false claim or false statement must be one that "cause[s] the Government to

30

pay out sums of money." Id. at 788. In any event, plaintiffs here do not allege that defendants obtained the Contract itself through false statements or fraudulent conduct.

Plaintiff suggests that his claim under § 3729(a)(1)(B) should be analyzed under a different standard, excluding altogether the requirement of a claim for payment. (See Pl's Sur-Surreply (DE 306) at 7).[25] Plaintiff cites no authority for this approach. While subsection (a)(1)(A) expressly requires a "claim for payment," subsection (a)(1)(B) incorporates by reference the same requirement, by applying to any "false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a) (emphasis added). The court in Grant recognized this when stating that "[i]n order for a false statement to be actionable under either subsection of the FCA, it must be made as part of a false or fraudulent claim." 912 F.3d at 196 (emphasis added).

In sum, the statements in the individual subcontracting reports do not provide a basis for False Claims Act liability.

ii.     Monthly Progress Payment Requests

Each monthly progress payment request contains the following certification, which plaintiff asserts provides a basis for False Claims Act liability: "I hereby certify, to the best of my knowledge and belief, that . . . [t]he amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract." FAR 52.232-5(b)(1); (see e.g., App. 26, 3018). Plaintiff asserts that this certification "should be read as an umbrella performance certification of the materials terms of the contract," which includes the requirement of "accurate" individual subcontracting reports. (Pl's Resp. (DE 286) at 5).

---

[25]     Plaintiff also suggests that defendants do not raise any challenge to plaintiff's § 3729(a)(1)(B) claim based upon the element of a claim for payment. (Pl's Resp. (DE 286) at 20). This is not correct. In the first sentence of their argument as to claim for payment, defendants identify both plaintiff's claim under § 3729(a)(1)(A) and § 3729(a)(1)(B). (Defs' Mem. (DE 275) at 5).

Under an express certification theory, "liability for a false certification will lie only if compliance with the statutes or regulations was a <u>prerequisite</u> to gaining a benefit, and the defendant affirmatively certified such compliance." <u>Harrison I</u>, 176 F.3d at 787 (emphasis in original). "[W]here the government has conditioned payment of a claim upon a claimant's certification of compliance with a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with <u>that statute or regulation</u>." <u>Id.</u> (emphasis added). The same reasoning applies when the government has conditioned payment on terms and conditions of a contract, such that liability will lie only if compliance with a term or condition is a prerequisite for payment and a defendant certifies compliance with <u>that term or condition</u>. <u>See United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.</u>, 543 F.3d 1211, 1217 (10th Cir. 2008).

Here, the monthly progress payment requests do not identify compliance with the terms and conditions of the Subcontracting Plan or FAR 52.219-8 as a prerequisite of payment and defendants did not certify compliance with those contract terms and conditions. (<u>See, e.g.</u>, App. 26, 3018). Therefore, the general certification in the monthly progress payment requests does not provide a basis for False Claims Act liability under an express certification theory.

Plaintiff argues that <u>Universal Health Services, Inc. v. United States ex rel. Escobar</u>, 136 S. Ct. 1989 (2016) ("<u>Escobar</u>"), rejects such a limitation on express certifications. <u>Escobar</u>, however, does not alter the express certification test as expressed in <u>Harrison</u> and <u>Conner</u>. Rather, it recognizes that another theory of certification altogether, the "implied false certification theory" may apply in certain circumstances. <u>See Escobar</u>, 136 S.Ct. at 1996. In particular, the court held that "False Claims Act liability for failing to disclose violations of legal requirements does not turn upon whether those requirements were expressly designated as conditions of payment." <u>Id.</u>

"Defendants can be liable for violating requirements even if they were not expressly designated as conditions of payment." Id. The court addresses in the next section whether plaintiff has met the requirements for an implied false certification theory, as described in Escobar.

iii.    Implied Certification

Under an implied certification theory, "liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." Id. at 1995.

> The implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.

Id. at 2001. For example, in Escobar, "by submitting claims for payment using payment codes that corresponded to specific counseling services, [the defendant] represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment." Id. at 2000. Any one apprised of such representations "would probably—but wrongly—conclude that the clinic had complied with core Massachusetts Medicaid requirements," related to staff training and qualifications, and "basic staff and licensing requirements." Id. (emphasis added). Failure to disclose defendant's violations of those requirements made defendant's claims for payment "misrepresentations." Id. at 2000-01.

Similarly, the United States Court of Appeals for the Fourth Circuit has stated that Escobar "made clear that it was targeting omissions that 'fall squarely within the rule that half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations.'" United States v. Triple Canopy, Inc., 857

33

F.3d 174, 178 (4th Cir. 2017) (quoting Escobar, 136 S. Ct. at 2000). In Triple Canopy, Inc., the defendant contractor "knew its 'guards' had failed to meet a responsibility in the contract," qualification in marksmanship, which the court deemed a "core contract requirement[]" in a contract for armed security services. 857 F.3d at 178.

Here plaintiff's claims fail at the second prong of the implied certification test. In particular, while the monthly progress payment requests make specific representations about the work provided, defendant did not fail to disclose noncompliance with material statutory, regulatory, or contractual requirements that make its representations in its claims for payment misleading half-truths. Small business certifications in individual subcontractor reports are neither "core" nor "basic" requirements of the work provided under the Contract, in the manner that staff training and licensing requirements are core and basic requirements of providing counseling and treatment in a Medicaid facility, Escobar, 136 S. Ct. at 2000, nor in the manner that shooting straight is a core and basic requirement of providing security in a warzone. Triple Canopy, 857 F.3d at 178.[26]

Thus, plaintiff's claim premised upon an implied certification theory fails as a matter of law. In sum, plaintiff fails to demonstrate a genuine issue of material fact that defendant made a false claim for payment, requiring dismissal of plaintiff's first three claims under the False Claims Act.

### b. Materiality

In addition, and in the alternative, plaintiff fails to demonstrate a genuine issue of fact as to the element of materiality.

---

[26]    Plaintiff suggests that defendants made additional representations in responding to the government's request for information on defendants' good faith effort to comply with the subcontracting plan. (Pl's Mem. (DE 286) at 11 n.7 (citing App. 2022-2499). But, that response is not a claim for payment, and it thus does not meet the first prong of the Escobar implied certification test. See Escobar, 136 S. Ct. at 2001.

34

"[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." Escobar, 136 S. Ct. at 2002 (quoting 31 U.S.C. § 3729(b)(4)). "[M]ateriality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Id. "[C]oncerns about fair notice and open-ended liability can be effectively addressed through strict enforcement of the Act's materiality and scienter requirements." Id. "Those requirements are rigorous," and "[t]he materiality standard is demanding." Id. at 2002-03.

"The False Claims Act is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." Id. at 2003. "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." Id. "Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." Id. "[W]hen evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." Id.

"[A] misrepresentation is material if it concerns a matter to which a reasonable person would attach importance in determining his or her choice of action with respect to the transaction involved." Id. at 2003 n.5 (emphasis added). "Materiality . . . cannot be found where noncompliance is minor or insubstantial," but rather a misrepresentation may be material "if it went to the very essence of the bargain." Id. at 2003 & n. 5.

"[P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." Id.

35

"Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." Id. "Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." Id. at 2003-04.

In this case, defendants' asserted misrepresentations are not material due to a combination of multiple undisputed facts. First, the government did not expressly identify compliance with the Subcontracting Plan and FAR 52.219-8 as a condition of payment. Rather, each application for payment notably is focused on the "work" completed. (E.g., App. 3013-3019). Each application for payment certifies "the work covered by this Application for Payment has been completed in accordance with the Contract Documents." (E.g., App. 3013). Likewise, each application certifies that "[a]s-built drawings are current, and the work for which this payment is requested, including stored material, are in compliance with contract requirements." (E.g., App. 3033; McHenry Aff. ¶10 (App. 3)). A "continuation sheet" to each submission includes a table showing "Description of Work," "Work Completed," and "Balance to Finish." (E.g., App. 22, 3015).

The FARs incorporated into the Contract reinforce this focus: "The Government shall make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contracting Officer, on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer." FAR 52.232-5(b) (emphasis added).[27] The Contractor's request for progress payments must include substantiation "related to the various elements of work required by the contract covered by the payment requested." FAR 52.232-5(b)(1) (emphasis added). Likewise, "[a]ll work . . . is subject to

---

[27] "Work" is defined in the FAR to include "materials, workmanship, and manufacture and fabrication of components." FAR 52.246-12(a).

Government inspection . . . before acceptance to ensure strict compliance with the terms of the contract." FAR 52.246-12(b) (emphasis added). In sum, monthly progress payments are premised upon physical construction work, not upon the reporting of compliance with small business targets.

Second, and by contrast, it is critical to materiality that the Subcontracting Plan and individual subcontracting reports are submitted and evaluated separately, in accordance with different administrative rules and procedures. The Subcontracting Plan is, on its face a "plan," showing "Total dollars planned to be subcontracted to small business concerns." FAR 52.219-9(c), (d)(2) (emphasis added). It includes "targets . . . proposed for the total contract." (App. 542) (emphasis added). The individual subcontracting reports are submitted periodically "so that the Government can determine the extent of compliance" with the Subcontracting Plan. FAR 52.219-9(d)(10)(ii) (emphasis added). They are not timed to coincide with monthly progress payment requests, but rather only twice per year. (App. 546). In contrast with monthly progress payment requests, the individual subcontracting reports do not identify work performed, particular types of subcontracts, or particular subcontract amounts. (Defs' Stmt. ¶¶ 132, 137).

Third, the certification in the individual subcontracting reports, and the consequences of certification are much different from the certification in the monthly progress payment requests. The subcontracting report certification is one of accuracy, and, if a contractor selects "No" to this certification, the "report will be rejected." (App. 994; see McGraw Dep. 151 (App. 1342)). In other words, that does not mean work will stop, or that progress payments will stop, but rather it is a consequence related to the Subcontracting Plan.

Relatedly, the consequence for failure to comply with the Subcontracting Plan goals is assessed "at contract completion," in accordance with an administrative procedure for determining whether a contractor "failed to make a good faith effort to comply with its subcontracting plan."

FAR 52.219-16(b). The FAR provides a process for "written notice" to the contractor, with opportunity for the contractor to respond and "to discuss the matter." FAR 52.219-16(c). The contracting officer must make a decision "after consideration of all the pertinent data," and may then assess "liquidated damages" in "an amount equal to the actual dollar amount by which the Contractor failed to achieve each subcontract goal." FAR 52.219-16(b). The Contractor further has a right to appeal any such final decision. FAR 52.219-16(e). Again, notably, this is not tied to work performance under the Contract, nor to deduction, retention, or return of progress payments.[28]

Fourth, the history of the government's actual payments made in this case, as well as the government's subsequent contracting relationship with defendants further precludes a determination of materiality. After plaintiff commenced this action on December 22, 2011, defendants submitted two progress payment requests in 2012, and the government paid them in full, in the aggregate amount of $9,334,584.64. (App. 1440). After an indictment was filed on February 11, 2014, charging Breslow with using Breslow Construction as a sham small business, and a criminal information was filed on February 14, 2014, charging Valdini Law Firm with aiding in the scheme, defendants submitted, and the government accepted, two individual subcontracting reports in 2014. (Id.; App. 681-688). Both of those reports disclosed the error in classification of Breslow Construction, and disclosed that defendants were not meeting their Small Business Plan goals. (App. 681-688).

Then, notably, despite the criminal charges filed and the government's completion of its intervention determination in the instant case, defendants submitted and the government paid

---

[28]    In contrast, regulations governing monthly progress payments include their own criteria for withholding payment: "[I]f satisfactory progress has not been made, the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved." FAR 52.232-5(e).

invoices on March 20, 2015, in the amount of $145,900.00, and on March 23, 2016, in the amount of $5,000.04. (App. 1440). Although these payments were very small in comparison to the total contract payments over time, in the aggregate of $194,731,380.97, it is nonetheless an additional materiality factor that these invoices were paid despite the errors in the individual subcontracting reports.

Likewise, it is further confirmation of non-materiality that the government actually proceeded in accordance with the parallel track administrative process for scrutinizing compliance with the Small Business Plan, by evaluating defendants' good faith effort to comply in 2015, rather than taking some other action regarding payments made or due under the Contract. (Defs' Stmt. ¶¶ 182-185). This factor is augmented by the undisputed fact that since 2012, the government has awarded more than 35 construction contracts to Caddell, including approximately 17 projects since the government decided not to intervene in this case. (Defs' Stmt. ¶ 193). Since March 2012, the government has awarded seven construction projects to Yates, one of which is a NAVFAC contract. (Defs' Stmt. ¶ 194); cf. Triple Canopy, 857 F.3d at 179 (noting factor for materiality that the government "did not renew its contract for base security with Triple Canopy and immediately intervened in the litigation").

Fifth, it is a factor precluding a determination of materiality that defendants did not violate "a requirement that the defendant[s] know[] is material to the Government's payment decision." Escobar, 136 S. Ct. at 1996 (emphasis added). In particular, there is no evidence that defendants knew that certification of compliance with the Subcontracting Plan and FAR 52.219-8 was material to the government's decision to make monthly progress payments under the Contract. There is likewise no evidence that any government officer told defendants otherwise, or that defendants should have believed otherwise, particularly given the other four objective materiality

factors as identified herein. To the contrary, McGraw testified: "based on my experience dealing with contracting officers, . . . pay applications [and] . . . performance" were "not tied to the [subcontracting] plan, and it was evaluated separate and apart." (App. 1325). McHenry testified: "[b]ased on my experience and knowledge, it is my belief and understanding that the Subcontracting Plan and its [individual subcontracting] reports have nothing to do with the request for payments submitted to the Government." (App. 3). He also testified: "I did not understand and had not reason to believe the . . . certification language [in the monthly progress payment requests] applied to or had anything to do with the Subcontracting Plan, compliance with that Plan or the [Individual Subcontracting Reports]." (App. 4).

For purposes of this materiality factor, the court does not undertake a determination that McGraw's or McHenry's understanding was correct for purposes of this factor, only that from their subjective standpoint, that is what they understood or had reason to understand to be the significance of the monthly progress payment requests, in contrast to separate certifications made for the individual subcontracting reports. In this respect, the Subcontracting Plan was not so obviously material to payment in the way that guns that "do not shoot" or "guards that cannot shoot straight" were in the examples highlighted in the following excerpts of Escobar and Triple Canopy:

> A defendant can have 'actual knowledge' that a condition is material without the Government expressly calling it a condition of payment. If the Government failed to specify that guns it orders must actually shoot, but the defendant knows that the Government routinely rescinds contracts if the guns do not shoot, the defendant has 'actual knowledge.' Likewise, because a reasonable person would realize the imperative of a functioning firearm, a defendant's failure to appreciate the materiality of that condition would amount to 'deliberate ignorance' or 'reckless disregard' of the 'truth or falsity of the information' even if the Government did not spell this out.

> Guns that do not shoot are as material to the Government's decision to pay as guards that cannot shoot straight.

40

<u>Triple Canopy</u>, 857 F.3d at 179 (emphasis added) (quoting <u>Escobar</u>, 136 S. Ct. at 2001-02).[29]

Plaintiff argues that defendants' representation of compliance with the Subcontracting Plan is material because the Contract expressly declared that the Subcontracting Plan is a "material part" of the contract. (Pl's Mem. (DE 286) at 13; <u>see</u> Pl's Sur-surreply (DE 306) at 10). But, the fact that the Subcontracting Plan is a "material part" of the contract is not the same as a determination that compliance with the Subcontracting Plan is material to each decision by the government to pay, which is "the transaction involved" with each monthly progress payment request. <u>Escobar</u>, 136 S.Ct. at 2003 n.5. As the foregoing analysis demonstrates, compliance with the Subcontracting Plan is important to the individual subcontracting reports and determination of whether targets have been met in good faith upon completion of the contract. Such compliance is not tied, however, in any respect to the government's decision to pay in response to monthly progress payment requests. Plaintiff's argument thus fails to address the key requirement of materiality to "the payment or receipt of money." <u>Id.</u>, at 2002 (quoting 31 U.S.C. § 3729(b)(4)).

Plaintiff cites to a "Presumed Loss Rule," set forth in the Small Business Jobs Act of 2010, 15 U.S.C. § 632(w)(1), and cases applying it, as an indication of materiality. That statute provides, in part:

> In every contract, subcontract, cooperative agreement, cooperative research and development agreement, or grant which is set aside, reserved, or otherwise classified as intended for award to small business concerns, there shall be a presumption of loss to the United States based on the total amount expended on the contract, subcontract, cooperative agreement, cooperative research and development agreement, or grant whenever it is established that a business concern

---

[29] Defendants suggested in their initial brief in support of summary judgment that an additional factor against a determination of materiality was that the government made payments "with knowledge that [defendants] used small businesses as first-tier subcontractors to administer work performed by lower-tier large businesses," in reference to plaintiff's allegation of a pass-through scheme. (Defs' Mem. (DE 275) at 13). The court does not rest its materiality determination on the government's knowledge of defendants' use of pass-through entities. Rather, the court addresses the government's knowledge of pass-throughs in addressing the element of defendants' scienter.

other than a small business concern willfully sought and received the award by
misrepresentation.

15 U.S.C. § 632(w)(1). While this statute illustrates the importance of small business contracting
to the government, and the extent of damages that may be recouped by the government in the event
of a failure of compliance with small business requirements, the statute does not advance the
analysis of materiality for purposes of a False Claims Act claim. Two circuit court cases cited by
plaintiff, United States v. Leahy, 464 F.3d 773, 778 (7th Cir. 2006), United States v. Blanchet, 518
F. App'x 932, 956-57 (11th Cir. 2013), are inapposite because they apply the presumed loss rule
in the context of sentencing calculations in criminal prosecutions for fraud, not False Claims Act
cases.

Two unpublished district court cases cited by plaintiff are instructively distinguishable and
lack helpful analysis of materiality. In United States ex rel. Lardner v. Smith & Nephew Inc., No.
217CV02013JPMEGB, 2018 WL 7050835 (W.D. Tenn. Sept. 17, 2018), plaintiff alleged in a
complaint that a defendant medical equipment manufacturer used a "sham small business non-
manufacturer to procure federal contracts." Id. at *1. The sham small business "submit[ted] a
product quotation and collect[ed] payment from the purchasing government agency before
transmitting most of those funds" to the defendant. Id. There, the court's analysis of materiality
linked the award of small business procurement contracts to the payment of government funds for
each. Id. at * 5. Here, by contrast, the initial award of the Contract is not the basis of plaintiff's
claim, giving rise to the need to evaluate the materiality of the certification of Subcontracting Plan
compliance to the payment of monthly progress payment requests.

The second district court case cited by plaintiff, United States ex rel. Savage v. Washington
Closure Hanford LLC, No. 2:10-CV-05051-SMJ, 2017 WL 3667709 (E.D. Wash. Aug. 24, 2017),
is inapposite for two reasons. First, the government brought claims there not only for False Claims

Act violations, but also for breach of contract, unjust enrichment, and payment by mistake. Id. at *2. This illustrates well that if the government asserts it did not receive the value for which it contracted, it may seek damages directly for breach of contract. Second, the court's analysis only addressed the issue of damages available for all of the asserted claims, see id. at *4, which is not the issue presented by the materiality element of a False Claims Act claim.

Plaintiff also argues that materiality is demonstrated by the felony prosecutions of Breslow and the Valdini Law Firm for making false statements in certifications of compliance with Small Business Act regulations. The seriousness of the misrepresentations caused by Breslow and the Valdini Law Firm is not in question. The fact that Breslow and Valdini Law Firm were charged with felonies for this conduct, however, detracts from rather than adds to a determination of materiality of defendants' certification of compliance with the Subcontracting Plan to payment. In particular, despite the government's awareness that the whole subcontract with Breslow Construction was tainted by serious fraud, this did not trigger a stop in payments, or demand for repayment of progress payments, or intervention in the instant case. Rather, it triggered the administrative process of evaluating whether defendants made good faith efforts to comply with the Subcontracting Plan.

In sum, due to the combination the foregoing multiple factors, plaintiff fails to establish a genuine issue of fact as to the element of materiality.

c. Scienter

In addition, and in the alternative, plaintiff fails to establish a genuine issue of fact as to the element of scienter.

Under the False Claims Act, the terms "knowing" and "knowingly" –

(A) mean that a person, with respect to information –
   (i) has actual knowledge of the information;

43

> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
> (iii) acts in reckless disregard of the truth or falsity of the information; and
> (B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b). As noted previously, the False Claims Act's "scienter requirements . . . are rigorous." Escobar, 136 S. Ct. at 2002 (citing United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1271 (D.C. Cir. 2010) ("SAIC")). "Establishing knowledge . . . requires the plaintiff to prove that the defendant knows . . . that it violated a contractual obligation . . . based on the proper standard for knowledge—which . . . excludes collective knowledge." SAIC, 626 F.3d at 1271. "This 'collective knowledge' doctrine would allow a plaintiff to prove scienter by piecing together scraps of 'innocent' knowledge held by various corporate officials, even if those officials never had contact with each other or knew what others were doing in connection with a claim seeking government funds." Harrison II, 352 F.3d at 918.

"Congress clearly had no intention to turn the FCA, a law designed to punish and deter fraud, into a vehicle for . . . imposing a burdensome obligation on government contractors rather than a limited duty to inquire." SAIC, 626 F.3d at 1274. "Although Congress defined 'knowingly' to include some forms of constructive knowledge, its definition of that term imposes liability for mistakenly false claims only when the defendant deliberately avoided learning the truth or engaged in aggravated gross negligence." Id. at 1274-75.

With these general principles of law in mind, the court considers in turn below the two categories of false claims asserted by plaintiff: 1) those arising from categorizing Breslow Construction as a small business, and 2) those arising from treating "pass-through" subcontracts as small business subcontracts.

i.    Breslow Construction

Plaintiff's claim premised upon categorizing Breslow Construction as a small business do not meet the standard of scienter because there is no genuine issue of fact that defendants obtained self-certifications from Breslow Construction and its attorney, and defendants relied upon those self-certifications in good faith.

In particular, the FAR expressly provide that "a contractor acting in good faith may rely on the written representation of its subcontractor regarding the subcontractor's status as a . . . . woman-owned small business concern." 48 C.F.R. § 19.703(b) (2008).  McGraw obtained just such a certification in this case from Breslow Construction, acting on behalf of defendants in preparing the individual subcontracting reports for the Contract.   On October 7, 2009, Ridgway executed for defendants the Ridgway Self-Certification Letter, certifying Breslow Construction as a women-owned small business. (Defs' Stmt. ¶ 108). McGraw relied upon Ridgway's self-certification that Breslow Construction was a women-owned small business in preparing the individual subcontracting reports that included Breslow Construction subcontract amounts in its percentages and totals. (McGraw Dep. 149 (App. 1341)).

The provision allowing reliance on such a self-certification form in "good faith" did not require further inquiry on the part of McGraw, McHenry, or any other employee of defendants, in light of the circumstances presented.  As an initial matter, the False Claims Act knowledge standard, even before consideration of the standard in FAR 19.703, encompasses a "limited duty to inquire." SAIC, 626 F.3d at 1274.  The "good faith" standard in FAR 19.703, reinforces the limited nature of inquiry required under the circumstances.  Although not defined in FAR 19.703, good faith commonly is defined as a "state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of

45

fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage." Good Faith, Black's Law Dictionary (10th ed. 2014).

Further, while the False Claims Act's "scienter requirement requires no proof of specific intent to defraud," the court must "presume that Congress retained all other elements of common-law fraud that are consistent with the statutory text because there are no textual indicia to the contrary." Escobar, 136 S. Ct. at 1999 n.2; see id. (citing Restatement (Second) of Torts § 529 (1976)). Among other principles of tort law governing fraudulent misrepresentations, "[t]he recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." Restatement (Second) of Torts § 540 (1977) (emphasis added). By contrast, "[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him." Id. § 541 (emphasis added).

Here, a combination of undisputed facts demonstrate as a matter of law that McGraw undertook sufficient steps on behalf of defendants to meet a standard of good faith reliance on the Breslow Construction self-certification forms. First, she relied upon the certification forms in the regular course of her duties for defendants. There is no genuine dispute that, to gather information to prepare the individual subcontracting reports, McGraw required each subcontractor to deliver to her a form styled "Small Business Concern Self-Certification." (Pl's Stmt. (DE 106) ¶ 106).

Second, the form she required subcontractors to sign was informative and included warnings to ensure subcontractor honesty. The form requires a subcontractor to indicate any socio-economic classifications applicable, and to "acknowledge[] that Caddell Yates Joint Venture will rely on the accuracy of the information." (App. 797). It also includes a warning that "[u]nder 15

46

U.S.C. 645(d), any person who misrepresents its status may be subject to" criminal sanctions. (Id.; McGraw Dep. 147 (App. 1339)).

Third, the specific response McGraw received from Breslow Construction, in the Ridgway Self-Certification Letter, was complete and gave no obvious indicia of unreliability or fraud. All sections were completed, and it was signed and clearly labeled with Ridgway's name and title, "Controller," followed by the date, October 7, 2009. (App. 797). There are no suspicious markings. The term "not certified" is handwritten next to the checked selection for "Women-Owned Small Business," providing further indication that the person who filled out the form was interested in portraying information on the form accurately and completely. (Id.).

Fourth, McGraw testified: "I understood that Yates in good faith could rely on the four corners of a document that was signed by someone with signatory power certifying that their business was, in fact, small." (App. 1333). In this respect, McGraw's subjective understanding of the importance of the self-certification is an additional factor precluding a determination that defendants were relying in bad faith on the self-certification of Breslow Construction.

Fifth, McGraw also testified, separately: "I understood that Mr. Pompano – or Mr. Canitano had an attorney, and so I would not be providing him with whether or not he is small." (App. 1332). McGraw testified that she was not aware of Breslow Construction until the individual subcontracting reporting period in October 2009, and she was not aware that Breslow Construction was the entity that was subject of prior communications between McHenry and Canitano. (App. 1327).

Similar factors compel a determination that McHenry relied in good faith on the Valdini Self-Certification Letter. On July 17, 2009, Canitano and McHenry exchanged emails regarding the benefits of consulting with counsel regarding certification. (App. 635). They further involved

47

McGraw in ensuring the types of information that would be required. (Defs' Stmt. ¶ 87). McGraw provided references to Canitano, including FAR 19.703(b). (Id.). The Valdini letter is formal and precise, and it includes supporting documentation. (App. 637). It is significant that the certification is one by an attorney, particularly one who held himself out as an expert in construction law, one who had at least one other attorney working with him, and one who had received warnings about the FAR provisions. (Defs' Stmt. ¶¶ 30-32, 91; App. 800-801). McHenry had known that Valdini had provided counsel to Pompano since February 2009. (Defs' Stmt. ¶ 87). There were thus no red flags about the competence or motives of Valdini. Based on the contents and context of this certification, there was no reason to doubt it or to conduct further inquiry into its accuracy.

Further, according to plaintiff, McHenry had suggested an attorney certification, "saying its okay" and "to get the right thing," wanting "additional protection." (Defs' Stmt. ¶ 84). McHenry testified he understood Breslow Construction "had hired an attorney that was well versed in government and contract law that was working on this. And that as long as they followed the small business regulations and do a self-certification then that that meets, you know, the requirements for the program." (App. 1397). McHenry testified: "I did not have any concerns about it, because at the time they were going through dealing with knowledgeable people, experts in this field, to set that up and do that correctly." (App. 1396-7).

In sum, both the Ridgway Self-Certification Letter and the Valdini Self-Certification Letter in themselves, based upon their content and context, preclude a determination of scienter on the part of defendants.

Plaintiff suggests that communications and circumstances preceding the Ridgway Self-Certification Letter and the Valdini Self-Certification Letter establish a genuine issue of material

48

fact as to whether defendants knew or should have known their small business certifications were false due to affiliation between Breslow Construction and Pompano Masonry. For example, plaintiff asserts that, in February 2009, defendants "knew that [] Breslow was the owner of Pompano Masonry; it received corporate structure documents showing this." (Pl's Mem. (DE 286) at 21 (citing App. 606-607)). Further, "[w]hen Breslow Construction was incorporated in June 2009, [defendants] knew that Breslow and Pompano had created it." (Id. (citing App. 1503-1504)).

These assertions, however, do not account for the determinative significance of the self-certification letters. Regardless of the information previously received by defendants about Breslow Construction and Pompano Masonry, and the individuals involved in creation of Breslow Construction, the self-certification letters by their contents and context provide a basis upon which defendants could rely in good faith in making Small Business certifications. McHenry and McGraw at the time had no reason to believe that Pompano Masonry's lawyers were incompetent or corrupt, or that Pompano Masonry and its lawyers had not worked through applicable affiliation rules. Possible prior affiliations between Pompano Masonry and Breslow Construction do not create an inference of bad faith, where the FAR provide that a newly formed business can rebut affiliation with an existing large company, and the affiliation rules are complex. See, e.g., 13 C.F.R. § 121.103.

Plaintiff also asserts that defendants "pressured Pompano [Masonry] to bring forth a small business entity," in May and June 2009 (Pl's Mem. (DE 286) at 22). Plaintiff cites, for example, defendants' delay in paying invoices to Pompany Masonry for work completed on the Project in May and June 2009 for this purpose. (Id.). Such pressure, however, does not tend to show that defendants knew or should have known Pompano Masonry was going to create an illegitimate or

sham small business. (See, e.g., App. 1278 (plaintiff stating, in testimony of McHenry: "Sham? No, he didn't mention that word. That's my word.")).

Plaintiff also cites internal communications by defendants' employees as evidence of scienter. For example, on September 14, 2009, Clint Bledsoe ("Bledsoe") sent Lisa Stokes an email, in response to her inquiry about payment of invoices, stating "It's all masonry work. Breslow is Pompano." (App. 1505). On June 15, 2010, Lisa Stokes sent McHenry an email stating: "I was told Breslow & Pompano were the same when I asked about joint checks." (App. 1492). These, however, are in the context of emails about accounting for payment, and not certification of Breslow Construction as a small business. Moreover, these statements lack probative value for scienter, on the issue of small business certification, where they do not take into account the Valdini and Ridgway self-certification letters.

Plaintiff further suggests that the "pass-through" relationship between Breslow Construction and Pompany Masonry should have alerted defendants that Breslow Construction was a sham entity and not a legitimate small business. (Pl's Mem. (DE 286) at 23). But, defendants had reason to believe that "pass-through" arrangements were acceptable to the government, as set forth in the next section of this order. Accordingly, the pass-through relationship does not undermine defendants' good faith reliance on the Valdini and Ridgway self-certifications.[30]

In sum, because of the undisputed facts concerning the contents and context of the Valdini and Ridgway self-certifications, plaintiff fails to establish a genuine issue of material fact on the element of scienter as it pertains to Breslow Construction.

---

[30]    Plaintiff cites to a December 9, 2013, American Arbitration Association award (App. 1447-1462), for the proposition that "the parties lied to the arbitrators about the fact that Breslow was a sham company." (Pl's Mem. (DE 286) at 23). The award of the arbitrators, however, does not state that the parties lied about the fact that Breslow was a sham company. (See App. 1447-1462). In any event, such a suggestion in the award would be inadmissible hearsay.

50

ii.    Pass-Through Subcontracts

Plaintiff asserts that defendants made false certifications of compliance with the Small Business plan by treating "pass-through" subcontracts as small business subcontracts.  Plaintiff's claims premised upon such pass-through subcontracts, however, fail as a matter of law on the element of scienter.

As an initial matter, plaintiff has not demonstrated a genuine issue of material fact that defendants knew or should have known certifications based upon pass-through subcontracts were false, because their classification under the terms of the Contract and the FAR was unsettled.  "It is well-established that the FCA requires proof of an objective falsehood."  United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 377 (4th Cir. 2008).  "As a result, mere allegations of poor and inefficient management of contractual duties are not actionable under the FCA."  Id.  "Likewise, imprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA."  Id.

Here, the Contract, including the Small Business Plan and the Contract's other incorporated FAR provisions, do not mandate self-performance by small business subcontractors.  The Contract expressly incorporates the full text of FAR 52.236-1, which provides that "[t]he Contractor shall perform on the site . . . work equivalent to at least 20% percent [sic] of the total amount of work to be performed under the contract."  (App. 586) (emphasis added).  The Contract is silent, by contrast, regarding self-performance by subcontractors.  (App. 577-579).

Plaintiff suggests that each subcontractor was mandated to have self-performed at least 20% of the total amount to be performed under their subcontract, because defendants included in each subcontract the following statement: "Subcontractor is mandated to comply with the Contract Award listed in Attachment 'C' Dated January 30, 2009, which includes but is not limited to Davis

51

Bacon Wage Determinations and Federal Acquisition Regulation (FAR) Section – 52." (Pl's Stmt.

¶ 47). Plaintiff suggests that each subcontractor therefore also was required to comply FAR

52.236-1, and perform at least 20% of the work under each subcontract. But, this is far from the

only reasonable interpretation of the Contract or the FAR. Where the contract incorporates 104

provisions of the FAR by reference, as well as a provision expressly applicable to the Contractor,

it is reasonable to interpret the Contract as being silent as to requirements for subcontractor

performance requirements for each subcontract.

Plaintiff argues that a Small Business Administration "Handbook for Small Business

Liaison Officers," dated January 2005, demonstrates scienter, where it states the following, in an

Appendix of "Frequently Asked Questions" (FAQ):



(App. 1669). As a threshold matter, it is not clear the pass-through described in the question is

analogous to those used by defendants, where the question does not mention a 1% or 2% fee. The

FAQ provides, moreover, that "[t]hese questions and answers provide guidance to prime

contractors but are not intended to replace regulations." (App. 1661). As such, they are not

binding authority on interpretation of the Contract or the FAR. "[N]on-authoritative guidance

generally 'is not enough to warn a regulated defendant away from an otherwise reasonable

interpretation' of a regulation for purposes of establishing FCA scienter." <u>United States ex rel.</u>

Complin v. North Carolina Baptist Hosp., 818 F. App'x 179, 184 n.6 (4th Cir. 2020) (quoting United States ex rel. Purcell v. MWI Corp., 807 F.3d 281, 290 (D.C. Cir. 2015)).

In any event, the court need not determine as a matter of law whether the Contract did or did not require subcontractors to perform at least 20% of the work under each subcontract, but rather only whether defendants' knew or should have known that it did. See Wilson, 525 F.3d at 377. "Consistent with the need for a knowing violation, the FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation." Complin, 818 F. App'x at 184 (quoting Purcell, 807 F.3d at 287-288). This "is especially true [as] here, where there is regulatory ambiguity." Id.[31]

In some cases, "evidence that a defendant was 'warned away' from its interpretation of an ambiguous regulation may suffice to show 'knowledge' of falsity" under the False Claim Act. Id. In this case, however, there is not evidence that defendant was "warned away" from interpreting its Contract and the FAR to allow pass-through subcontracts. Rather, defendants disclosed both the concept of pass-through subcontracts to the government, and specific pass-through subcontracts to the government, but received no warning away from this approach.

With respect to the concept of a pass-through, Smith emailed Jerry T. Williams ("Williams"), and other government contract officers, on May 21, 2009, describing a proposed "approach on the electrical subcontracts," under which defendants "contract with a Native American Small Business electrical contractor as the electrical construction manager." (App. 716).

---

[31]    Plaintiff cites United States ex rel. Tran v. Computer Scis. Corp., 53 F. Supp. 3d 104, 121 (D.D.C. 2014), where the court rejected a defendant contractor's argument that a "pass-through scheme is unquestionably proper." As discussed in the text above, the court's analysis does not rest upon a determination that the pass-throughs were unquestionably proper. Moreover, Tran is instructively distinguishable. There, the court noted, for purposes of a motion under Federal Rule of Civil Procedure 12(b)(6), that under the alleged Subcontracting Plan there alleged, "the Small Business must actually perform the work described in the subcontracting plan—the work cannot be performed by a second tier subcontractor or by an entity that is not a Small Business." Id. at 111.

53

"The Native American small business electrical subcontractor, <u>will, in turn, subcontract the work</u> to multiple electrical subcontractors, one of them being a Yates affiliated company." (<u>Id.</u>) (emphasis added). "The Native American small business will have the responsibility for the execution of the entire electrical scope of work, as the electrical construction manager." (<u>Id.</u>). In this respect, Smith described a scenario involving a pass-through of work from a small business subcontractor to a large business. Williams forwarded this description to Joseph McGrenra ("McGrenra"), a NAVFAC deputy for small business, for guidance, noting defendants "can not meet the small business requirements with a large business performing the electrical [and] they are trying to provide a solution to meet the goals established in their contract." (App. 511). McGrenra responded, noting, inter alia, "[a]s long as the Native American Small Business is a Small Business, they can count that as subcontracting." (App. 511). Finally, Williams circles back to Smith, and McHenry, and others with defendants, that "what you proposed will be acceptable," without further comment. (<u>Id.</u>).

Plaintiff suggests that the foregoing example is not probative because it involves a different pass-through arrangement than those with a 1% or 2% fee, and it is limited to electrical contractors, and defendants did not suggest other pass-through arrangements in the foregoing example. These differences, however, are beside the point that defendants discussed the concept of a pass-through arrangement with the government and they received approval, rather than warnings, to use a pass-through arrangement. The foregoing example also illustrates that defendants sought guidance from the government to come up with "a solution to meet the goals established in their contract," (App. 511), where existing large business subcontractors would not enable achievement of those goals. Such dialogue with the government is probative of a lack of scienter. <u>See</u> <u>United States ex rel. Becker v. Westinghouse Savannah River Co.</u>, 305 F.3d 284, 289 (4th Cir. 2002) ("[T]he

54

government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation."); United States ex rel. Spay v. CVS Caremark Corp., 875 F.3d 746, 756-57 (3d Cir. 2017) ("Generally, where the government and a contractor have been working together, albeit outside the written provisions of the contract, to reach a common solution to a problem, no claim arises.").

In addition, defendants submitted numerous change order pricing proposals for NAVFAC review and approval showing that first-tier small businesses were further subcontracting the work to second tier-large businesses. (McHenry Aff. ¶¶ 28-34 (App. 8-14)). These proposals in plain view included cover letters from the first tier small businesses showing the 1% to 2% fee or price difference, followed by the second-tier large business work descriptions and charges. (E.g., App. 36-37, 40-41, 44-45, 47-48, 50, 53-54, 56-57, 73-74, 75-77, 80-81, 83-85, 87-88, 90-91, 95-96, 101-103, 109-110, 117-118, 120-121, 122-124, 186-187, 198-199, 261-262, 307-309, 338-339, 407-408, 454-455, 498-501). On some occasions, these proposals expressly disclosed the first-tier small business "management fee" of 1% or 2% of the large business subcontractor labor and work pricing. (E.g., App. 44, 47, 53, 56-57, 62, 65, 73, 87, 120, 265, 454). In other instances, the 1% to 2% fee was described as an added value such as "profit and overhead," "OH&P," or "handling fee," or not described at all. (E.g., App. 36, 40, 76, 80, 84, 87, 109, 123, 286, 308, 330, 365, 498). These change order pricing proposals were transmitted to the government, and were among the topics discussed at weekly meetings between McHenry and NAVFAC construction managers and project managers, including Walton and Patton. (App. 8; e.g., App. 51-57, 58-59, 67, 104-108, 112-113, 152-155, 255-262, 323-325, 382, 441-446, 503). There is no evidence these officials objected or raised issue with these arrangements, and these change orders were paid to include the

fees for small business's participation together with the large business subcontractor's work and labor.  (App. 14; <u>e.g.</u>, App. 116, 252-253, 290, 382, 515-516, 721).

For example, on one occasion, Patton responded to a change order request stating: "I don't take any exception to the unit prices, etc., but I'm not sure why we would pay for 1328 locks when there are only 1312 doors . . . I redid the calculations using the given unit prices <u>and standard mark-ups</u> and came up with $81,624 . . . I am going to move forward with executing the modification at this price." (App. 245) (emphasis added).  The proposal submitted showing 1328 locks included a "2% Management Fee" of First Construction, as well as the description by second tier subcontractor C.H. Edwards immediately following without the markup.  (App. 253-254).[32]

In addition, McHenry testified, "on several occasions I met with the NAVFAC Small Business Representative" who was Kim Valone ("Valone"), "to show her our approach to subcontracting with small businesses that in turn would further subcontract all the work to large businesses."  (McHenry Aff. ¶ 21 (App. 6)).  According to McHenry:

> These discussions included the names of the subcontractors, the various subcontract amounts, and that the small business subcontractor would be involved in contract administration and was expected to have an onsite representative while further subcontracting all the labor and work to second tier large businesses.  The purpose of these meetings was to explain how [defendants] would achieve the small business subcontracting goals in order to be sure NAVFAC did not have any concerns or issues with the small business receiving a 1 to 2% fee and further subcontracting all labor and work to a large business.  The Small Business Representative did not have any issues with that approach and did not indicate there was anything improper about that above approach.
>
> A true and correct copy of an email I sent to NAVFAC concerning one of these meetings is attached hereto as Exhibit B.  This email string was created in the

---

[32]     Plaintiff objects to defendants' citation to this example in their response to plaintiff's surreply, on the basis that defendants asserted it "for the first time."  (Pl's Sur-Surreply (DE 306) at 9).  Defendants, however, relied in their initial brief in support of summary judgment upon the entirety of the change order submissions and responses as described and summarized in the McHenry affidavit, which submissions include the example discussed in the text above.  (Defs' Mem. (DE 275) at 24).

56

regular course of business at the time indicated and stored and maintained in the regular course of business in the electronic files of Yates.

From these discussions, I knew NAVFAC, including its Small Business Representative, knew that [defendants were] subcontracting with these (5) small businesses (identified in paragraph 18 above) who received a 1 to 2% fee and further subcontracted all the labor and work to large businesses. I also knew NAVFAC and the Small Business Representative had no questions, concerns or objections and approved of the way this was done.

(McHenry Aff. ¶¶ 21-22 (App. 6-7)). The email referenced as Exhibit B in McHenry's testimony

is an October 5, 2009, email from McHenry to Walton, construction manager for NAVFAC,

stating:

We met with Kim [Valone] today and she was very helpful. She mentioned that we needed to share the [Small Business Administration] plan with Jerry [Williams, government supervising contract officer]. Is there any way we could come by tomorrow and review it with the two of you? It might come up (probably will) on Wednesday and I would feel better if we could explain it in person before hand.

(App. 29).

In addition, McHenry testified:

[W]e basically carried our small business program over and showed what we were doing and trying to . . . [meet] a 77 percent goal. . . . And in doing so we wanted to make sure that we complied with the requirement. So on several occasions we met with [Valone] . . . to get her guidance and direction on what we were doing and to make sure that she didn't see anything that was out of line or incorrect.

(App. 1356). McHenry explained to Valone "that [they] had a bridge contractor that was working

with a small business and that the small business would be managing the overall process, <u>but would

not be performing the actual labor and work on those contracts</u>." (App. 1359) (emphasis added).

McHenry further testified "we met with them on numerous occasions and showed them our

breakdown and told them who we were using." (App. 1401).

Plaintiff raises several objections to the foregoing testimony. Plaintiff argues, for example,

that it does not establish that the government knew of all the details of the pass-through

subcontracts, such as "that the pass-through entities had no relevant know-how and did no

'management' work." (Pl's Mem (DE 286) at 25). Plaintiff also suggests that McHenry never told the government how the first-tier subcontractors performed in practice, such as "reading romance novels all day in a trailer on site," and making "rare" appearances at daily subcontractor meetings. (Id.). However, the foregoing testimony remains probative show without dispute that the pass-through subcontracts themselves were disclosed to the government, that the change order requests documenting pass-throughs were disclosed to the government, and that defining concepts about them, such as the 1% to 2% fee and the lack of substantive work performance, also were disclosed to the government.[33] The foregoing testimony is also probative to show defendants presented these concepts to the government and did not know or should not have known that the government warned them against such an approach. Whether defendants disclosed actual performance under the pass-through subcontracts, such as a worker reading romance novels all day or making rare appearances at meetings, is irrelevant to the scienter inquiry in this context. See Escobar, 136 S. Ct. at 2002-03 (noting the False Claims Act is not a "vehicle for punishing garden-variety breaches of contract or regulatory violations").

Plaintiff also argues that "McHenry's testimony as to NAVFAC officers' statements is inadmissible hearsay that cannot be considered." (Id.). However, in those parts where McHenry's testimony portrays a response by the government to the information he provided, it is considered not for the truth of the matter asserted by the government declarant (e.g., "pass-through

---

[33]     As one example out of many, a Power Mulch cover letter for a "change order request for . . . kitchenette mirror" discloses its charge of $73,457.30, and the second-tier contractor B.R. McMillian's charge of $72,730.00, while plainly showing on the face of the cover letter "Power Mulch Services" logo and footer stating "Erosion Control Solutions." (App. 460-461) (emphasis added). In other words, the lack of substantive expertise is disclosed on the face of the document provided for government review.

58

arrangements are acceptable"), but rather to show defendants' knowledge of the government's response.  See Fed. R. Evid. 801(c)(2).[34]

Plaintiff also asserts that there is "no corroborating evidence" of what McHenry told the government, and there is "no documentation of any paperwork that McHenry supposedly reviewed with [Valone] or gave to her."  (Pl's Stmt. (DE 280) ¶ 55).  Plaintiff argues that "[t]he credibility of McHenry and other witnesses on these matters is for the jury to decide, considering the testimony of all witnesses and admitted exhibits that indicate contrary facts."  (Id.).  However, plaintiff does not cite to contrary testimony of Valone or any other witness about what was presented to the government about pass-through subcontracts.  Plaintiff does not create a genuine issue of material fact by speculating about what other witnesses not before the court would say, or by asserting generally that McHenry's testimony is not corroborated or not credible.  See Matsushita, 475 U.S. at 587; Anderson, 477 U.S. at 248;  Lovelace, 681 F.2d at 241.

Plaintiff suggests that McHenry's testimony is controverted by statements made by Walton, as reported in a Naval Criminal Investigative Service (NCIS) report dated May 31, 2012. (E.g., Pl's Stmt. (DE 280) ¶¶ 112-118; Pl's Resp. (DE 286) at 26). The NCIS report provides, in part: "WALTON explained that aside from the submission of certified payroll records, the OICC [Officer in Charge of Construction] has no knowledge or interaction for [sic] subcontractors hired by a prime contractor to work on a specific construction project."  (App. 1768).  As an initial

---

[34]        By contrast, plaintiff cites two reports authored by "Fitzgerald & Associates, LLC" that portray contentions by Baker Roofing Company, regarding the intentions of defendants and MPi in entering into pass through-subcontracts.  (Pl's Mem. (DE 286) at 21-22 (citing App. 2918-3006 (reports captioned Baker Roofing Company v. MPI Business Solutions and Caddell Yates, "Preliminary Impact Analysis and Change Order Request" and Precision Walls, Inc. v. MPI Business Solutions and Caddell Yates, "Preliminary Impact Analysis and Claim for Damages")); see Pl's Stmt. ¶¶ 260-263).  Plaintiff's reliance on the contentions contained in these reports as a basis for proving defendants' scienter is flawed due to double hearsay and lack of basis in personal knowledge, which deficiencies are not remedied by commentary thereon in deposition testimony of subcontractor employees, Baker and Farmer.  (App. 3007-3012).

59

matter, the quoted statement is hearsay (Walton's explanation of OICC's knowledge or interaction), within hearsay (the report of investigating agent). See Fed. R. Evid. 801(c). Moreover, the quoted statement does not controvert McHenry's testimony about what he showed Valone, or what he showed any government officer. While plaintiff argues that "Rule 56 does not require the nonmoving party to depose her own witness," or allows plaintiff to present evidence by affidavit, (Pl's Surreply (DE 295) at 8), the NCIS report is not an affidavit of Walton. Plaintiff has not forecasted through declaration or affidavit what Walton would testify if called at trial, much less Valone, on the issue of pass-through subcontracts. Thus, the NCIS report is insufficient to create a genuine issue of fact as to scienter.

In sum, the combination of the foregoing undisputed facts precludes a determination that defendants knew or should have known that certifications encompassing the pass-through subcontracts were false. Therefore, plaintiff has failed to establish a genuine issue of material fact as to scienter relating to pass-through subcontracts.

> 2. Reverse False Claims

Plaintiff asserts in his fourth claim that defendants concealed or failed to disclose their obligation to repay the government, in violation of the "Reverse False Claims" provision of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G). (2d Am. Compl. 77, 80). Plaintiff contends that defendants "improperly retain[ed] funds to which they were not entitled," and improperly avoided or decreased an obligation to pay liquidated damages. (Id. ¶¶ 256, 276).

The False Claims Act imposes liability, in § 3729(a)(1)(G), upon any person who makes false claims to avoid or decrease an "obligation" to pay the government. The term "obligation" "means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from

statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b). Although the Fourth Circuit has not addressed the standard for a claim under this provision, other courts have held that a plaintiff must "identify an established duty that would bring [the] matter within the scope" of the False Claims Act, and the provision is "not meant to cover . . . contingent obligations," or "unadjudicated and unassessed statutory fines." United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co., 843 F.3d 1033, 1039 (5th Cir. 2016). "Contingent obligations—those that will arise only after the exercise of discretion by government actors—are not contemplated by the statute." Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc., 190 F.3d 729, 738 (6th Cir. 1999).

Here, plaintiff's claim under § 3729(a)(1)(G) fails as a matter of law because defendants did not have an established obligation to pay liquidated damages. Rather, defendants had an obligation to pay liquidated damages that was contingent upon the government's determination that defendants' did not have a good faith basis for failing to meet targets in the Subcontracting Plan. (Defs' Stmt. ¶¶ 182-183). The asserted obligation was thus dependent upon the exercise of discretion by government actors, and it was unadjudicated and unassessed.

Plaintiff argues nonetheless that defendants' duty to pay liquidated damages for "breach of" the Subcontracting Plan is an "obligation" within the meaning of the reverse false claims provision. (Pl's Mem. (DE 286) at 30-31). Plaintiff emphasizes that the term "obligation" is defined as a duty arising "from the retention of any overpayment." (Id. at 31 (quoting § 3729(b)(3)). This definition, however, does not advance plaintiff's claim. The government made $194,731,380.97 in payments to defendants based upon their performance requests. (App. 522-523). Under the terms of the Contract and the FAR, a "breach" of the Subcontracting Plan does not trigger a repayment of any those performance payments. FAR 52.219-16(b)-(c). It does not

even result in an automatic obligation to pay separate liquidated damages, but rather triggers an administrative process for determining liquidated damages, if any. Id.

In sum, plaintiff's fourth claim, under § 3729(a)(1)(G), fails as a matter of law.

3. Anti-Kickback Act

Plaintiff asserts in his fifth claim that defendants violated the Anti-Kickback Act, 41 U.S.C. § 53, by unlawfully offering and providing kickbacks to Pompano Masonry and/or Breslow Construction in connection with the Project, then 1) making false statements in claims for payment that they had in place reasonable procedures designed to prevent violations of the Anti-Kickback Act, and 2) including the amount of kickbacks in the contract price charged to the government on the Project. (2d Am. Compl. ¶¶ 279-281). Plaintiff suggests that defendants paid Breslow Construction 2% more than it was going to pay Pompano Masonry in the original masonry subcontract as a "kickback" to induce Pompano Masonry to use Breslow Construction as a sham small business. (Id. ¶ 135).[35]

a. False Claims Act

In that part where plaintiff asserts a claim for violation of the False Claims Act premised upon defendants' certification of compliance with the Anti-Kickback Act, (id. ¶ 280), the claim fails for the same reasons as plaintiff's other claims under the False Claims Act. In particular, plaintiff has not established a false claim for payment expressly or impliedly conditioned upon compliance with the Anti-Kickback Act. Plaintiff has not demonstrated that any certification of compliance with the Anti-Kickback Act was material to the government's decision to pay under

---

[35] Although not asserted in the complaint, plaintiff also asserts in his brief in opposition to summary judgment that defendants violated the Anti-Kickback Act when "[t]he 1% to 2% fees paid to small business pass-throughs by [defendants] for rental of their status, and received by those small businesses, constituted 'kickbacks' within the meaning of the Anti-Kickback Statute." (Pl's Mem. (DE 286) at 28).

the monthly progress payment requests.  And, plaintiff has not demonstrated a genuine issue of fact as to scienter.

   b. Anti-Kickback Act

 In that part where plaintiff asserts a stand-alone claim under the Anti-Kickback Act on the basis that defendants included the amount of a "kickback" to Pompano/Breslow Construction in contract prices charged to the government, the claim fails as a matter of law.

 Under 41 U.S.C. § 8702:

A person may not—

(1) provide, attempt to provide, or offer to provide a kickback;
(2) solicit, accept, or attempt to accept a kickback; or
(3) include the amount of a kickback prohibited by paragraph (1) or (2) in the contract price—
(A) a subcontractor charges a prime contractor or a higher tier subcontractor; or
(B) a prime contractor charges the Federal Government.

41 U.S.C. § 8702 (formerly codified as 41 U.S.C. § 53).   The statute provides a civil action for violation of this provision, which is limited as follows:

The Federal Government in a civil action may recover from a person--
(1) that knowingly engages in conduct prohibited by section 8702 of this title a civil penalty equal to--
(A) twice the amount of each kickback involved in the violation; and
(B) not more than $10,000 for each occurrence of prohibited conduct; and
(2) whose employee, subcontractor, or subcontractor employee violates section 8702 of this title by providing, accepting, or charging a kickback a civil penalty equal to the amount of that kickback.

Id. § 8706(a).

 As a threshold matter, apart from plaintiff's claim brought under the False Claims Act due to alleged false certification of compliance with the Anti-Kickback Act, (2d Am. Compl. ¶ 280), plaintiff has not provided any authority for obtaining damages based on a stand-alone claim for a violation of the Anti-Kickback Act.  The statute expressly provides a cause of action only for "[t]he

Federal Government in a civil action," and it does not provide its own basis like the False Claims Act for suit by a private plaintiff on behalf of the government. Id.; see, e.g., United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 848 F.3d 366, 371 (5th Cir. 2017) ("In this civil-enforcement action, the Government alleged that Kellogg Brown & Root was liable for kickbacks knowingly accepted by two of its employees. . . . The Government can enforce this prohibition through civil or criminal enforcement, or both.") (citing 41 U.S.C. §§ 8706-8707); cf. United States ex rel King v. Solvay Pharm., Inc., 871 F.3d 318, 324 (5th Cir. 2017) (stating, with respect to the Medicare anti-kickback statute ("AKS"), 42 U.S.C. § 1395nn, "[t]he AKS provides no private right of action; therefore, a private plaintiff may not sue a health care provider under the AKS alone").

In any event, plaintiff has not demonstrated a genuine issue of material fact that defendants "knowingly" included a "kickback" in the amount of a government contract price. 41 U.S.C. §§ 8702, 8706(a). In particular, for the reasons discussed above regarding the scienter element of plaintiff's False Claims Act claims, there is no plausible basis to infer that defendants knew the 2% fee paid to Breslow Construction, or the 1% to 2% fees paid to pass-through small businesses, was an unlawful kickback.

Therefore, plaintiff's Anti-Kickback Act claim fails as a matter of law and must be dismissed.[36]

C.     Status of Defendants Breslow and Valdini Law Firm

As noted in the statement of the case, plaintiff names Breslow and Valdini Law Firm as defendants in the operative second amended complaint. Plaintiff asserts that due to a settlement

---

[36]     Because the court has determined that all claims against defendants fail as a matter of law, the court does not reach defendants' additional argument that the court should grant summary judgment to defendants on plaintiff's claims for damages. (See Defs' Mot. (DE 271) at 3).

reached in 2014 he has "released" the Valdini Law Firm "as to all claims, except for statutory attorneys' fees." (2d Am. Compl. (DE 190) at 8 n.1). In any event, there is no proof of service of the second amended complaint on either defendants Breslow or Valdini Law Firm. Absent such proof of service, the court hereby provides notice to plaintiff that it will dismiss without prejudice defendants Breslow and Valdini Law Firm, pursuant to Federal Rule of Civil Procedure 4(m), unless plaintiff shows within 14 days of the date of this order good cause for failure to serve them. If no response to this order is filed by plaintiffs within 14 days of the date of this order, the clerk is directed to enter a separate judgment dismissing without prejudice defendants Breslow and Valdini Law Firm.

## CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 271) is GRANTED. The clerk is DIRECTED to enter judgment in favor of defendants on all claims asserted against them. The court retains jurisdiction solely for purposes of disposition of defendants Breslow and Valdini Law Firm, in accordance with section C. herein. If no response to this order is filed by plaintiffs within 14 days of the date of this order, the clerk is DIRECTED then to enter a separate judgment dismissing without prejudice defendants Breslow and Valdini Law Firm, and to close this case.

SO ORDERED, this the 30th day of March, 2021.


LOUISE W. FLANAGAN
United States District Judge

65

# Appendix A

# Index of Names

<u>Caddell Construction Company, Inc. ("Caddell")/W.G. Yates & Sons Construction Company ("Yates")</u>

Sid Adams ("Adams") – construction manager for Caddell
Clint Bledsoe ("Bledsoe") – project manager for Caddell/Yates
Del Buck ("Buck") – vice president/estimator for Caddell
John Caddell ("Caddell") – executive vice president for Caddell
Dick Fitzgibbons ("Fitzgibbons") – vice president/estimator for Yates
Richard Gurner ("Gurner") – estimator for Yates
Chet Hailey ("Hailey") – comptroller for construction operations for Yates
Diana McGraw ("McGraw") – marketing coordinator for Yates
Cleetus E. McHenry ("McHenry") – project executive for Caddell/Yates
Monte McKinney ("McKinney") – executive vice president for Caddell
Tom Newton ("Newton") – subcontractor administrator for defendants
John Mark Smith ("Smith") – vice president for Yates
Lisa Stokes ("Stokes") – Yates employee


<u>Pompano Masonry Corporation ("Pompano")/Breslow Construction, LLC ("Breslow Construction")</u>

Julian Marie Breslow ("Breslow") – director/owner of Pompano/Breslow Construction
Jillian Breslow and Lauren Breslow – Breslow's daughters
Joseph Canitano ("Canitano") – vice president for North Carolina operations of Pompano
Timothy Carroll ("Carroll") – vice president or Maryland operations of Pompano
Plaintiff/relator Rickey C. Howard ("plaintiff") – estimator/president of Pompano
Elaine Parris ("Parris") – associate of David J. Validini & Associates, P.A. ("Valdini Law Firm")
Mike Ridgway – chief financial officer of Pompano
Stephen Jay Siegel ("Siegel") – director/president of Pompano
David J. Valdini ("Valdini") – attorney for Pompano/Breslow Construction


<u>Government</u>

Joseph J. McGrenra ("McGrenra") – deputy for small business for Naval Facilities Engineering Command Mid-Atlantic ("NAVFAC")
J.D. Patton ("Patton") – project manager for NAVFAC
Kim Valone ("Valone") – small business representative for NAVFAC
Vernon Ashley Walton ("Walton") – construction manager for NAVFAC
Jerry T. Williams ("Williams") – supervising contract officer for NAVFAC

Other entities

Frank Baker ("Baker") – employee of subcontractor
William Barbee ("Barbee") – retained expert for plaintiff
Robert Farmer ("Farmer") – employee of subcontractor
Reginald Foy, Jr. ("Foy") – employee of subcontractor
Larry A. Hinson ("Hinson") – employee of subcontractor
Nathan Huff ("Huff") – counsel of record for Caddell/Yates
Patsy Reeves ("Reeves") – retained expert for defendants
Charles Tiefer ("Tiefer") – retained expert for plaintiff